**1:15-cv-06607-SAS**
## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **JOHNS-MANVILLE CORPORATION** | ) | **82-B-11656 (CGM)** |
| _Debtor._ | ) | |
| **THE BOGDAN LAW FIRM,** | ) | |
| **AS COUNSEL FOR SALVADOR** | ) | |
| **PARRA, JR.** | ) | |
| _Appellant,_ | ) | **1:15-cv-06607-SAS** |
| **v.** | ) | |
| **MARSH USA, INC., THE TRAVELERS** | ) | |
| **INDEMNITY COMPANY, AND** | ) | |
| **TRAVELERS CASUALTY AND** | ) | |
| **SURETY COMPANY** | ) | |
| _Appellees._ | ) | |

## ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF APPELLANT THE BOGDAN LAW FIRM,
## AS COUNSEL FOR SALVADOR PARRA, JR.

Sander L. Esserman
Peter C. D'Apice
David J. Parsons
Heather J. Panko
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 969-4900
Facsimile:  (214) 969-4999
_Counsel for The Bogdan Law Firm, As Counsel for Salvador Parra, Jr._

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012(a), The

Bogdan Law Firm certifies as follows:

1.     The Bogdan Law Firm is 100% owned by Eric Bogdan, an

individual.

2.     No publicly held corporation owns 10% or more of the stock of

The Bogdan Law Firm.

Dated: October 26, 2015

/s/ *Peter C. D'Apice*
Peter C. D'Apice
Sander L. Esserman
David J. Parsons
Heather J. Panko
STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas  75201
(214) 969-4900

**ATTORNEYS FOR THE BOGDAN
LAW FIRM, AS COUNSEL FOR
SALVADOR PARRA, JR.**

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES............................................................. v

I.   PRELIMINARY STATEMENT ..................................................1

II.  STATEMENT OF JURISDICTION .........................................2

III. STATEMENT OF THE ISSUES AND STANDARD OF
     REVIEW...........................................................................4

     A.  Issues Presented ........................................................4

     B.  Standard of Review ...................................................5

IV.  STATEMENT OF THE CASE ...................................................7

V.   STATEMENT OF THE FACTS...................................................8

     A.  Manville Filed for Bankruptcy Under the Weight of
         its Massive Asbestos Liabilities and Reached a
         Settlement with its Insurers ...............................................8

     B.  Travelers Sought to Invoke the Confirmation Order
         to Enjoin Plaintiffs from Asserting Claims Against
         Travelers for its Independent Misconduct ........................9

C.   The Bankruptcy Court Held that Due to the Extensive and Intertwined Relationship Between Manville and Travelers, the Independent Claims Against Travelers are Barred by the Confirmation Order ...............................................11

D.   After Granting *Certiorari*, the Supreme Court Entered a Narrow Ruling that the Extensive Relationship Between Travelers and Manville Subjects the Independent Claims against Travelers to the Confirmation Order ........................................................12

E.   Parra Sued Marsh, Asserting that Marsh Misused and Concealed Information about Asbestos that it Obtained from a Number of its Clientele, not just Manville.............................................................................13

F.   Without any Factual Support, Marsh Sought the Enforcement of the 1986 Orders against Parra, Alleging that Marsh is entitled to the Same Protections as Travelers.......................................................14

VI.  SUMMARY OF ARGUMENT ....................................................18

VII. ARGUMENT ................................................................24

A.   The Bankruptcy Court's Reading of the Insurance Settlement Order and the Marsh Settlement Ignores the Supreme Court's Warning Against Stretching the Reach of the Phrase "Related To" Way Too Far and is Not Supported by the Record Below.................................................24

**B. Faced with a Material Factual Dispute Affecting the Application of the 1986 Orders to Parra's Claims, the Bankruptcy Court Erred When it Denied Parra the Benefit of Discovery and a Full Evidentiary Hearing on the Extent of the Relationship between Marsh and Manville** ........................................................................31

    *1. The Bankruptcy Court's Refusal to Allow Parra to Take Discovery and hold a Full Evidentiary Hearing Denied Parra of the Procedural Protections Afforded to Him By the Bankruptcy Code* .........................................................31

    *2. The Bankruptcy Court Erred when it Concluded that the Allegations in Parra's Complaint are Judicial Admissions Binding on Parra in the Proceedings before the Bankruptcy Court* .......................................................35

**C. The Bankruptcy Court's Cursory Review of the Record below Led to the Erroneous Conclusion that Para, a non-Manville Asbestos Plaintiff with Asbestos Related Claims Against Marsh for Marsh's Own Independent Actions, Received Adequate Notice that his Non-Derivative Claims Against Marsh Would be Barred by the 1986 Orders** ...................................39

**VII. CONCLUSION** .............................................................46

**CERTIFICATE OF COMPLIANCE** .................................48

**CERTIFICATE OF SERVICE** .........................................49

**ADDENDUM** ...................................................................50

# TABLE OF AUTHORITIES

## CASES

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F.
  Supp. 2d 79 (S.D.N.Y. 2004).................................................................37

*Banks v. Yokemick*, 214 F. Supp. 2d 401 (S.D.N.Y. 2002) ....................36

*Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995)..........................40

*Five Mile Capital Partners LLC v. MSR Resort Golf Course, LLC
  (In re MSR Resort Golf Course LLC)*, No. 13 Civ. 2448(KFP),
  2014 WL 67364 (S.D.N.Y. Jan. 7, 2014) ................................................6

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*,
  398 B.R. 736 (S.D.N.Y. 2008) ..........................................................6, 7

*Hausler v. JP Morgan Chase Bank, N.A.*, No. 09-CV-10289, --- F.
  Supp. 3d ---, 2015 WL 5236481 (S.D.N.Y. Aug. 4, 2015) .................21, 36, 37

*Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319 (5th Cir. 2001) ....................37

*Hoodho v. Holder*, 558 F.3d 184 (2d Cir. 2009) ....................................36

*I.R.S. v. Lange (In re Netal, Inc.)*, 498 B.R. 225 (B.A.P. 8th Cir.
  2013) ..................................................................................6, 32

*In re Ames Dep't Stores, Inc.*, 582 F.3d 422 (2d Cir. 2009)....................6

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d. Cir. 2004)..................42

*In re Johns-Manville Corp.*, 36 B.R. 743 (Bankr. S.D.N.Y. 1984) .................41, 43

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) ......................43

*In re Johns-Manville Corp.*, No. 82-B-11656, 2004 WL 1876046
  (Bankr. S.D.N.Y. Aug. 17, 2004) ......................................................8, 11, 34

*In re United States Lines, Inc.*, 197 F.3d 631 (2d Cir. 1991) ..................6

*Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-
  Manville Corp.)*, 600 F.3d 135 (2d Cir. 2010)................................9, 40

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988)................29

*Kregler v. City of New York*, 821 F. Supp. 2d 651 (S.D.N.Y. 2011)....................36

*Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus.)*,
467 B.R. 694 (S.D.N.Y. 2012) ..............................................................5

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .................40

*Mulvania v. I.R.S. (In re Mulvania)*, 241 B.R. 1 (B.A.P. 9th Cir.
1997) .........................................................................................32

*New York State Conference of Blue Cross & Blue Shield Plans v.
Travelers Ins. Co.*, 514 U.S. 645 (1995) ...............................................28

*New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S.
293 (1953) ..................................................................................40

*NOVA Info. Sys., Inc. v. Premier Operations, Ltd. (In re Premiere
Operations)*, 294 B.R. 213 (S.D.N.Y. 2003) ............................................6

*Rockstone Capital LLC v. Metal*, 508 B.R. 552 (E.D.N.Y. 2014) .........................6

*UNR Indus., Inc. v. Walker (In re UNR Indus., Inc.)*, 224 B.R. 664
(Bankr. N.D. Ill. 1998) ....................................................................41

*White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689
(Bankr. D. Kan. 2006) .....................................................................40

## STATUTES

11 U.S.C. § 102(1) ...........................................................................32

11 U.S.C. § 102(1)(A) ......................................................................32

11 U.S.C. § 105(a) ............................................................................4

11 U.S.C. § 1103 .............................................................................44

11 U.S.C. § 1141(a) ...........................................................................4

11 U.S.C. § 1142(b) ...........................................................................4

11 U.S.C. § 524(g)(4)(B) ...................................................................42

28 U.S.C. § 158(a)(1) .........................................................................4

28 U.S.C. §158(a) .............................................................................4

## OTHER AUTHORITIES

Fed. R. Bankr. P. 9014, 2002 Advisory Committee Notes ......................... 20, 32

**RULES**

Fed. R. Bankr. P. 8002 ............................................................................4

Fed. R. Bankr. P. 8003 ............................................................................4

Fed. R. Bankr. P. 9014 ...................................................................... 20, 31

Fed. R. Bankr. P. 9014(a)........................................................................31

# I.
## PRELIMINARY STATEMENT

The Bogdan Law Firm, as counsel for Salvador Parra, Jr. ("*Parra*")—a non-Manville asbestos plaintiff suffering from asbestosis—appeals from the July 27, 2015 memorandum decision and accompanying August 5, 2015, order entered in the Johns-Manville Corporation ("*Manville*") bankruptcy case, by the Honorable Cecelia G. Morris, granting Marsh USA, Inc.'s[1] motion to enforce the confirmation order and certain related orders, described below, against Parra barring his state court claims for personal injuries brought against Marsh in Jones County, Mississippi (the "*Parra Action*").

---

[1] Marsh USA, Inc. filed the motion as Marsh USA, Inc., individually and as successor in interest to Marsh & McLennan, Inc.; Marsh USA, Inc., a Mississippi Corporation; Marsh USA, Inc., a Louisiana Corporation; Marsh USA, Inc., a Texas Corporation; Marsh USA Agency, Inc., a Texas Corporation; Marsh & McLennan of Delaware, Inc.; Marsh & McLennan of Dallas, Inc.; Houseman & Company, Inc.; J&H Marsh & McLennan, Inc.; J&H M&M ELC, Inc.; and Marsh USA Risk Services, Inc. (collectively, "*Marsh*").

## II.
## STATEMENT OF JURISDICTION

On December 18, 1986, the United States Bankruptcy Court for the

Southern District of New York (the "***Bankruptcy Court***"), Honorable

Burton R. Lifland presiding, entered an order (the "***Insurance Settlement***

***Order***") approving a settlement agreement entered into between Johns-

Manville Corporation and many, if not most, of its major insurers (the

"***Insurance Settlement Agreement***"), as well as certain other insurance

related settlement agreements, including Manville's October 10, 1986

settlement agreement with Marsh (the "***Marsh Settlement Agreement***").

Four days later, on December 22, 1986, the Bankruptcy Court entered an

order (the "***Confirmation Order***," and together with the Insurance

Settlement Order, the "***1986 Orders***") confirming Manville's plan of

reorganization (the "***Manville Plan***").

On July 8, 2010, Parra filed his First Amended Complaint (the "***Parra***

***Complaint***") in his personal injury action against, among others, Marsh.

The Parra Complaint asserts claims against Marsh based on Marsh's

independent and non-derivative misconduct, including negligent undertaking and breaches of various common law duties.

On August 6, 2010, Marsh filed its Motion for Order Enforcing Confirmation Order and Related Orders (the "***Motion to Enforce***") asking the Bankruptcy Court to hold that the channeling injunction issued in conjunction with the Manville Plan and the provisions of the Insurance Settlement Order barred certain asbestos-related personal injury claims asserted by Parra against Marsh in the Parra Action. (Doc. No. 9135).[2]  On July 27, 2015, the Bankruptcy Court issued its Memorandum Decision Granting the Motion of Marsh USA to Enforce the Confirmation Order ("***Memorandum Decision***") (Doc. No. 4171) and on August 5, 2015, it entered its corresponding Order Enforcing the Johns-Manville Confirmation Order and Related Orders ("***Marsh Order***") (Doc. No. 4173).

On August 19, 2015, The Bogdan Law Firm, as Counsel for Salvador Parra, Jr., filed a timely Notice of Appeal to the United States District Court

---

[2]   All references to "Doc. No. ___" are references to documents filed in the Bankruptcy Court in Manville's bankruptcy, Case No. 82-B-11656.

for the Southern District of New York, pursuant to 28 U.S.C. §158(a) and Federal Rules of Bankruptcy Procedure 8002 and 8003, appealing the Memorandum Decision and Marsh Order.  (Doc. No. 4174).

The Bankruptcy Court had jurisdiction over the Motion to Enforce pursuant to the jurisdiction retention provisions contained in the Confirmation Order and the Manville Plan, the authority conferred on the Bankruptcy Court under Sections 105(a), 1141(a) and 1142(b) of the Bankruptcy Code, and the Bankruptcy Court's inherent power to interpret and enforce its own orders.  This Court has jurisdiction over this appeal from the Memorandum Decision and the Marsh Order pursuant to 28 U.S.C. § 158(a)(1) as this is an appeal from a final order of the Bankruptcy Court.

## III.
## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

### A.    Issues Presented

Issue One:        Did the Bankruptcy Court err in denying Parra discovery in order to develop an evidentiary record showing that Marsh obtained its knowledge of and influence in the asbestos industry from sources other than Manville?

Issue Two:  Did the Bankruptcy Court err in holding that it could determine the applicability of the 1986 Orders to Parra based solely on the allegations of Parra's complaint filed in the Parra Action?

Issue Three:  Did the Bankruptcy Court err in holding that the limited allegations in Parra's complaint filed in the Parra Action constituted an evidentiary record sufficient for the Bankruptcy Court to hold that Marsh's relationship with Manville was so inextricably intertwined that Parra could not proceed with his action against Marsh without violating the 1986 Orders?

Issue Four:  Did the Bankruptcy Court err in holding that Parra's claims against Marsh are barred under the 1986 Orders, as claims sufficiently "related to" services performed by Marsh for Manville?

Issue Five:  Did the Bankruptcy Court err in holding that Parra received constitutionally sufficient notice of the effects of the bankruptcy on his rights against Marsh, a non-debtor?

## B. Standard of Review

A bankruptcy court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*. *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus.)*, 467 B.R. 694, 698 (S.D.N.Y. 2012). In the case of a mixed question of law and fact, the findings of fact are reviewed under the clearly erroneous standard and the conclusions of law are reviewed *de*

*novo.  NOVA Info. Sys., Inc. v. Premier Operations, Ltd. (In re Premiere Operations)*, 294 B.R. 213, 217 (S.D.N.Y. 2003) (citing *In re United States Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1991)). Under the clearly erroneous standard, factual findings are "clearly erroneous" when the reviewing court is left with the definite and firm conviction that a mistake has been made. *Five Mile Capital Partners LLC v. MSR Resort Golf Course, LLC (In re MSR Resort Golf Course LLC)*, No. 13 Civ. 2448(KFP), 2014 WL 67364, *5 (S.D.N.Y. Jan. 7, 2014) (quoting *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009)).

The bankruptcy court's decisions regarding discovery and whether to hold an evidentiary hearing are reviewed for an abuse of discretion. *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736, 748 (S.D.N.Y. 2008); *Rockstone Capital LLC v. Metal*, 508 B.R. 552, 558 (E.D.N.Y. 2014); *I.R.S. v. Lange (In re Netal, Inc.)*, 498 B.R. 225, 228 (B.A.P. 8th Cir. 2013).  Under the abuse of discretion standard, an appellate court may reverse the decision of a bankruptcy court where "(1) its decision rests on an error of law (such as the application of the wrong legal principal) or a

clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decision." *In re Alper Holdings USA, Inc.*, 398 B.R. at 748-49.

## IV.
## STATEMENT OF THE CASE

The overarching issue in this appeal is whether the 1986 Orders operate to bar Parra's state court claims against Marsh for Marsh's independent misconduct.  Parra is not a Manville asbestos claimant and cannot file a claim with the Manville Trust for his claims against Marsh. The Marsh Order thus deprives Parra of the ability to pursue any redress for Marsh's injurious conduct.  The Bankruptcy Court should have conducted a factual analysis of whether Marsh is in fact entitled to the same protections as Travelers.[3]  Instead, it ignored the specific facts and

---

[3] "*Travelers*" means the Travelers Indemnity Company, Travelers Casualty and Surety Company, and certain affiliates, contemplated by the Bankruptcy Court's August 17, 2004 Findings of Fact and Conclusions of Law Regarding Travelers Motions for Approval of Certain Settlement Agreements and for Entry of a Clarifying Order.  *In*

circumstances surrounding Parra's complaint against Marsh and without

proper analysis applied the Supreme Court's decision in *Travelers Indemnity*

*Co. v. Bailey*, 557 U.S. 137 (2009)—a decision expressly narrow in its scope

as being applicable only with respect to claims against Travelers—to

Marsh. This deprived Parra of the procedural protections afforded to him

under the Federal Rules of Bankruptcy Procedure and fundamental

constitutional principles of due process.

## V.
## STATEMENT OF THE FACTS

**A.    Manville Filed for Bankruptcy Under the Weight of its Massive
Asbestos Liabilities and Reached a Settlement with its Insurers.**

Manville, buckling under the weight of its asbestos liability, filed for

protection under Chapter 11 of the United States Bankruptcy Code in

August of 1982. "Between October 1983 and July 1984, in order '[t]o avoid

the uncertainty of the insurance litigation and to fund its plan of

reorganization, Manville sought to settle its insurance [coverage] claims.'"

---

*re Johns-Manville Corp.*, No. 82-B-11656, 2004 WL 1876046 (Bankr.
S.D.N.Y. Aug. 17, 2004).

*Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.)*,

600 F.3d 135, 138 (2d Cir. 2010) (internal citation omitted).  On July 18, 1984,

it largely achieved this goal by entering into the Insurance Settlement

Agreement with many, if not most, of its major insurers. (*See* Exhibit A to

Parra's Response (defined below)).  The Insurance Settlement Agreement is

more properly described as 23 separate settlement agreements with similar,

but not identical, terms.  Manville's settlements with Travelers and Marsh

were among the settlements consolidated into the Insurance Settlement

Agreement.

On December 18, 1986, the Bankruptcy Court entered the Insurance

Settlement Order approving, amongst other insurance settlement

agreements, the Insurance Settlement Agreement and the Marsh Settlement

Agreement.  The Manville Plan was confirmed on December 22, 1986.

**B.    Travelers Subsequently Sought to Invoke the Confirmation Order
to Enjoin Plaintiffs from Asserting Claims Against Travelers for its
Independent Misconduct.**

Years after confirmation of the Manville Plan, a number of asbestos

victims sought recovery directly from Travelers for the part Travelers

9

played in perpetuating the asbestos epidemic and in aggravating the

damages and harm suffered by asbestos victims.  Certain asbestos victims

initiated litigation against Travelers, not on account of Travelers status as

Manville's insurer, but for its own, independent tortious acts.  These

victims did not seek relief from Manville's insurance proceeds or from the

Manville asbestos trust (the "*Manville Trust*"), but directly from Traveler's

own funds.  These actions included allegations that Travelers intentionally

acted on its own to suppress information and knowledge about asbestos

hazards and intentionally propagated a "state of the art" defense to

wrongfully frustrate or defeat lawful rights of asbestos victims.

Travelers moved in the Bankruptcy Court to enjoin 27 such claims

pending in Louisiana, Massachusetts, Texas and West Virginia state courts.

In November 2003, as a settlement of these claims, Travelers agreed to pay

up to $445 million into a fund that would be used to pay the claims.  This

settlement was conditioned upon the entry of a "clarifying order" by the

Bankruptcy Court, which was to state, in essence, that the claims against

Travelers were and always had been barred by the 1986 Orders.  Certain of

Manville's other insurers (the "*Objecting Insurers*") and a group of

plaintiffs with independent claims against Travelers (the "*Objecting*

*Plaintiffs*") objected.

**C.    The Bankruptcy Court Held that Due to the Extensive and Intertwined Relationship Between Manville and Travelers, the Independent Claims Against Travelers are Barred by the Confirmation Order.**

On August 17, 2004, the Bankruptcy Court issued extensive findings

of fact and conclusions of law, describing in great detail Travelers'

relationship with Manville. *See In re Johns-Manville Corp.*, 82-B-11656, 2014

WL 1876046 (Bankr. S.D.N.Y. Aug. 17, 2014). On the same date, the

Bankruptcy Court entered the order requested by Travelers (the

"*Clarifying Order*") (Doc. No. 3751), which held that—based on the

Bankruptcy Court's finding that "Travelers learned virtually everything it

knew about asbestos from its relationship with Manville"—the

independent claims against Travelers were barred.

Certain of the Objecting Insurers and the Objecting Plaintiffs

appealed the Clarifying Order to the District Court, which affirmed, for the

most part, the Bankruptcy Court's ruling. The Objecting Insurers and the

11

Objecting Plaintiffs then appealed to the Second Circuit Court of Appeals,

which reversed the affirmance of the District Court, holding that the

Bankruptcy Court lacked subject matter jurisdiction to enjoin the

independent actions against Travelers.

**D.    After Granting *Certiorari,* the Supreme Court Entered a Narrow Ruling that the Extensive Relationship Between Travelers and Manville Subjects the Independent Claims against Travelers to the Confirmation Order.**

Travelers sought, and the Supreme Court granted, *certiorari*.  In a

June 18, 2009 opinion, the Supreme Court held that the Second Circuit's

ruling was in error because the Bankruptcy Court's subject matter

jurisdiction to enter the injunctions in its 1986 Orders was not properly

before the Second Circuit.  *Travelers*, 557 U.S. at 148.  The Supreme Court

then went on to analyze whether the Bankruptcy Court's 1986 Orders

applied to the independent, non-derivative claims against Travelers.  The

Supreme Court held that—based on the Bankruptcy Court's extensive

factual findings of the extensive relationship between Travelers and

Manville—the independent claims against Travelers fell within the scope of

the 1986 Orders.  *Travelers*, 557 U.S. at 148-49.  The Supreme Court

expressly stated that its holding was narrow, and did not address the other agreements approved in the Insurance Settlement Order.  Furthermore, the Supreme Court's analysis was limited to Traveler's relationship with Manville, not any other parties that may have obtained knowledge from sources other than Manville and used or concealed that knowledge to the detriment of asbestos victims.  *Travelers*, 557 U.S. at 155.

**E.  Parra Sued Marsh, Asserting that Marsh Misused and Concealed Information about Asbestos that it Obtained from a Number of its Clientele, not just Manville.**

On July 8, 2010, Parra filed the Parra Complaint against, *inter alios*, Marsh. (*See* Parra Complaint, attached as Exhibit A to the Declaration of Brian E. O'Connor dated March 18, 2014, Doc. No. 4088).  The Parra Complaint is premised on claims of direct, independent, and non-derivative misconduct on the part of Marsh, including claims of negligent undertaking and claims based on Marsh's breach of various common law duties to Parra independent of any relationship with Manville.

For instance, Parra alleges, "that Marsh USA, Inc. aided and abetted and conspired with Defendants including, but not limited to, Foster

Wheeler, Riley Stoker, General Electric, Bechtel Corporation, and other

entities such as Johns Manville, Fibreboard and The Lummus Company."

(Parra Complaint at 11, ¶ 8.l).  Parra further alleges that:

> Defendant Marsh willfully suppressed the truth as to the risks
> and dangers associated with the use of and exposure to
> Defendants' (such as Foster Wheeler, Riley Stoker, General
> Electric and Bechtel Corporation) and other entities (such as
> Johns Manville and The Lummus Company) asbestos-
> containing products and/or machinery requiring or calling for
> the use of asbestos and/or asbestos containing products.

(Parra Complaint at 19-20, ¶ 33).

## F.   Without any Factual Support, Marsh Sought the Enforcement of the 1986 Orders against Parra, Alleging that Marsh is entitled to the Same Protections as Travelers.

On August 6, 2010, Marsh filed the Motion to Enforce with the

Bankruptcy Court alleging that Parra's claims against Marsh are barred by

the 1986 Orders.  Marsh made no attempt to develop the sort of exhaustive

factual record developed by Travelers, but argued that it was entitled to the

blanket application of the *Travelers* ruling to Parra's claims based on its

own relationship with Manville.  (Motion to Enforce at 13-14).  Without

submitting even a scintilla of evidence, Marsh even went so far as to allege

that "[l]ike Travelers, Marsh 'learned virtually everything it knew about asbestos from its relationship with Manville'"—an entirely unfounded assertion which the Bankruptcy Court did not allow to be tested. (Motion to Enforce at 14).

On August 23, 2010, Parra and The Bogdan Law Firm, as his counsel, filed a response ("*Parra's Response*") (Doc. No. 3919), seeking (1) to have the Motion to Enforce converted to an adversary proceeding, (2) discovery and an evidentiary hearing and/or (3) denial of the Motion to Enforce. Parra argued that Marsh was not entitled to the protections afforded to Travelers without bringing forth evidence establishing that Marsh's relationship with Manville was so inextricably intertwined that Marsh could only have learned everything that it knew about asbestos and gained its influence in the asbestos industry through its relationship with Manville.

Marsh's failure to provide the Bankruptcy Court with any evidence of its relationship with Manville was glaring when juxtaposed to Parra's evidence showing that Marsh entered the asbestos insurance industry long

before Manville joined its clientele and that Marsh independently participated in activities through which it gained its asbestos knowledge. (*See* Parra's Response at 13-15 and accompanying Exhibits).  This evidence, Parra argued, showed that Marsh, unlike Travelers, could not have learned everything it knew from Manville.  Accordingly, Parra requested the opportunity to take discovery and conduct a full evidentiary hearing to fully develop the nature, extent and sources of Marsh's knowledge of the risks and hazards of asbestos.  Parra also argued that as a future claimant, he was not given constitutionally sufficient notice of the broad injunctions to which Marsh claimed it was entitled under the 1986 Orders. (Parra's Response at 25-30).

On August 30, 2010, Marsh filed its reply (Doc. No. 3927), and on November 12, 2010, Travelers filed its Submission of Travelers Indemnity Company and Travelers Casualty and Surety Company Concerning Motion for Order Enforcing Confirmation Order and Related Orders.  (Doc. No. 3956).

The Bankruptcy Court held the Motion to Enforce in abeyance for several years, pending the resolution of the *Travelers* litigation about the 1986 Orders. (Memorandum Decision at 10). In March 2010, the Bankruptcy Court ordered the parties to brief the question of whether discovery should be allowed. (Memorandum Decision at 10). On March 20, 2014, both Parra and Marsh filed their respective briefs on the discovery issue. The Bankruptcy Court continued to hold the matter in abeyance until a final status conference on February 26, 2015.

Subsequently on July 27, 2015, the Bankruptcy Court issued the Memorandum Decision finding that: (1) Marsh was entitled to proceed with the Motion to Enforce by motion; (2) Parra was not entitled to discovery because the allegations in the Parra Complaint amounted to judicial admissions that were sufficient to establish Marsh's relationship with Manville; (3) the claims asserted in the Parra Complaint against Marsh are barred by the 1986 Orders; and (4) Parra's due process rights were not violated by the 1986 Orders because the future claimants' representative (the "Manville FCR") appointed in Manville's bankruptcy sufficiently

represented the interests of future asbestos claimants with claims against

Manville.  On August 5, 2015, the Bankruptcy Court entered the Marsh

Order granting the Motion to Enforce. (Marsh Order at 2).

## VI.
## SUMMARY OF ARGUMENT

In holding that Parra's claims against Marsh are barred by the 1986

Orders, the Bankruptcy Court made several critical errors.

First, the Bankruptcy Court misapplied the Supreme Court's ruling in

*Travelers* when holding that "claims and allegations which are in ***any way***

'related to' Marsh's insurance coverage of Manville are barred by the 1986

Orders."  (Memorandum Decision at 18) (emphasis added).  The Supreme

Court did not hold that all independent, non-derivative claims against

third parties which are in ***any way*** related to Manville were barred.

Instead, the Supreme Court's analysis and its reliance on the evidentiary

record established by Travelers bears out the Supreme Court's

determination that there must be a sufficient nexus between the conduct

complained about and the services provided by the third party to Manville

such that the former would not have occurred but for the latter.  Travelers

established this nexus by providing evidence that "Travelers learned virtually everything it knew about asbestos from its relationship with Manville." *Travelers*, 557 U.S. at 144.  Marsh established no such nexus.  In fact, Marsh failed to introduce any evidence as to how its malfeasance was in any way attributable to the insurance brokerage services it provided Manville. The Bankruptcy Court's application of the *Travelers* decision ignored the Supreme Court's clear warning not to stretch the "connection between the insurer's action complained of and the insurance coverage" to the point of absurdity.  *Travelers*, 557 U.S. at 149.  To confer upon Marsh the protections it requested, the Bankruptcy Court should have required Marsh to set forth sufficient evidence to prove that its relationship with Manville was so intertwined that Manville was virtually the sole source of Marsh's asbestos related knowledge, such as the Bankruptcy Court did with Travelers.

Second, the Bankruptcy Court erred when it denied Parra the opportunity to conduct discovery and hold an evidentiary hearing. The question of the nature and extent of Marsh's relationship with Manville is

19

critical to the determination of the application of the 1986 Orders to Parra's

claims.  Because the facts regarding this issue were in dispute, Federal Rule

of Bankruptcy Procedure 9014 required the Bankruptcy Court to hold an

evidentiary hearing to resolve the dispute.  Fed. R. Bankr. P. 9014, 2002

Advisory Committee Notes ("[I]f the motion cannot be decided without

resolving a disputed material issue of fact, an evidentiary hearing must be

held…").  Accordingly, the Bankruptcy Court abused its discretion when it

denied Parra the opportunity to conduct discovery and a full evidentiary

hearing.

Third, the Bankruptcy Court erred when it held that it "could

determine the application of the 1986 Orders based solely on the

allegations in the Complaint," and that the statements in the Parra

Complaint were judicial admissions as to Parra.  (Memorandum Decision

15-16).  The statements in the Parra Complaint do not qualify as judicial

admissions because they are mere allegations that are subject to proof and

are not formal concessions by Parra concerning matters that are peculiarly

within Parra's knowledge or control.  Furthermore, they were not binding

against Parra in the Bankruptcy Court, because judicial admissions are only

binding in the proceeding in which they are made and Parra did not make

these statements before the Bankruptcy Court. *Hausler v. JP Morgan Chase

Bank, N.A.*, No. 09-cv-10289 (VM), 2015 WL 5236481, *16 (S.D.N.Y. Aug. 4,

2015).

Even if the statements were judicial admission, which they were not,

the allegations in the Parra complaint are not sufficient to establish that

Marsh's relationship with Manville was so inextricably intertwined as to

allow the Bankruptcy Court to conclude that Marsh learned everything

that it knew about asbestos from its relationship with Manville.  Faced with

a factual question about the nature and extent of the relationship between

Marsh and Manville, as well as the source of Marsh's considerable

knowledge and influence in the asbestos insurance industry, the

Bankruptcy Court should have developed a factual record regarding these

questions and rendered a decision anchored in fact.  Accordingly, the

Bankruptcy Court erred when it determined that it could rely solely on the

allegations in the Parra Complaint to determine whether his claims were barred by the 1986 Orders.

Finally, the Bankruptcy Court erred when it held that Parra received sufficient due process notice of the impact the 1986 Orders would have on his claims against Marsh for Marsh's independent, non-derivative misconduct. The Manville FCR was appointed to represent future asbestos claimants in the Manville bankruptcy in order to protect their interests *as to their claims against Manville*, and this was undeniably the sole focus of the Manville FCR's work in the bankruptcy case. There is no indication in the record below that the Manville FCR considered the impact of the 1986 Orders on future claimants' right to pursue claims against non-debtor third-parties, such as Marsh, for independent, non-derivative malfeasance unrelated to Manville. Similarly, the notice campaign conducted in connection with the confirmation of the Manville Plan was solely directed at alerting future claimants to the effect that the Manville Plan would have *on Manville's liability*, not the liability of Marsh. Notices focused on Manville's liability would not have provided future claimants with

sufficient detail to put them on notice that their unknown future claims against Marsh for its own independent non-derivative misconduct were about to be barred by confirmation of the Manville Plan.  Parra's due process rights with respect to his claims against Marsh were, therefore, not properly protected and the Bankruptcy Court erred when it held that Parra is bound by the 1986 Orders.

Because of these errors, the Bankruptcy Court improperly declared that Parra, an asbestos plaintiff who is not seeking recovery from Manville, is barred from seeking redress for his asbestos related injuries against Marsh, a non-debtor third party.  This action left Parra with nowhere to turn to seek compensation for his injuries.  The Manville Trust was established to compensate asbestos victims for Manville's asbestos liability. Parra cannot seek recovery from the Manville Trust for Marsh's independent non-derivative misconduct that is not related to the insurance services provided to Manville.  Such a result finds no support in the Supreme Court's narrow holding in *Travelers*.

# VII.
# ARGUMENT

**A.** **The Bankruptcy Court's Reading of the Insurance Settlement Order and the Marsh Settlement Ignores the Supreme Court's Warning against Stretching the Reach of the Phrase "Related To" Way Too Far and is Not Supported by the Record Below.**

The Bankruptcy Court misconstrued the Supreme Court's holding in *Travelers* and the plain language of the Marsh Settlement Agreement when it held that "claims and allegations which are in ***any way*** 'related to' Marsh's insurance coverage of Manville are barred by the 1986 Orders." (Memorandum Decision at 18) (emphasis added). The Supreme Court did not hold that all independent, non-derivative claims against third parties which are in ***any way*** related to Manville were barred by the 1986 Orders. Instead, both *Travelers* and the clear language of the Marsh Settlement Agreement require that there exist a sufficient nexus between the conduct complained off and the services provided to Manville. This connection must be so strong that the conduct complained of could not have been performed for any other purpose than the services Marsh provided to Manville. The record below does not support such a conclusion. Before

barring Parra's claims, the Bankruptcy Court should have required Marsh

to bring forth sufficient evidence to support its entitlement to the

protection of the 1986 Orders.

Marsh acted as an insurance broker and risk management consultant

to, *inter alios*, numerous asbestos companies throughout the twentieth

century, including Manville.  In January 1982, Manville, sued Marsh

alleging that Manville's failure to have full coverage for its liabilities was

Marsh's fault due to some dereliction of its duties as Manville's broker.  To

resolve the disputes between them, Manville and Marsh entered into the

Marsh Settlement Agreement which resolved "Marsh Claims," which were

defined as follows:

> "Marsh Claims" means any and all claims, demands, allegations, duties, liabilities and obligations (whether or not presently known) which have been, or could have been, or might be asserted by **any Person** against the Marsh Group based upon, **arising out of or relating to services** (whether acts or omissions) **performed by the Marsh Group for the JM Group**, at any time, in connection with insurance policies issued to or for the benefit of any of the JM Group (other than insurance policies issued to any individual member of the JM Group which were not issued in connection with such

> member's employment by the JM Insured),
> including, without limitation, the negotiation,
> placement and securing of such policies, and
> attempts to receive the proceeds of, as well as the
> application for, advice concerning and any claims
> asserted under, such policies.

(Marsh Settlement Agreement at 8-9).

With respect to the Marsh Claims, the Insurance Settlement Order
provides that

> (D)  commencing on the Plan Confirmation Date, all
> Persons, except Marsh, are restrained and enjoined
> from commencing and/or continuing any action,
> suit, arbitration or other proceeding of any type or
> nature against the Marsh Group based upon,
> arising out of, or related to Marsh Claims.

(Insurance Settlement Order at 103-04, ¶14.2(d)).

The clear language of these provisions indicates that the only claims

against Marsh that are barred by the 1986 Orders are those claims that arise

out of or are related to the services that Marsh performed for Manville.

Thus, to establish that Parra's claims are barred by the 1986 Orders, it was

incumbent upon Marsh to establish a connection between its malfeasance

(or alleged malfeasance) and the services it performed for Manville as

opposed to services it provided to other clients or Marsh's own self-interest

relating to personal injury litigation involving the asbestos industry as a whole.  In other words, Marsh's misconduct had to have been connected to the insurance brokerage services provided directly to Manville. Marsh did not attempt to prove this.

Instead of requiring Marsh to bring forth some evidence to support its bald assertion that "Marsh 'learned virtually everything it knew about asbestos, from its relationship with Manville," (Motion to Enforce at 14), the Bankruptcy Court relied on an overly-encompassing interpretation of the phrase "related to" to conclude that Parra's claims against Marsh for its own independent non-derivative misconduct are barred by the 1986 Orders.  (Memorandum Decision at 16 – 21).  However, the Supreme Court counseled courts against stretching the phrase "related to" too far—stating that "[t]here is, of course, a cutoff at some point, where the connection between the insurer's action complained of and the insurance coverage would be thin to the point of absurd." *Travelers*, 557 U.S. at 149.  The Supreme Court has warned against giving the phrase "related to" an overly broad interpretation in other contexts too, recognizing that the

phrase "related to" at face value is not helpful in determining the scope of

the statutes or injunctive provisions because the reach of the phrase is

indeterminate and "universally, relations stop nowhere." *New York State*

*Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645,

655 (1995) (citation omitted).  Instead of focusing on the breadth of the

phrase "related to" when determining the reach of the injunctive

provisions in the Marsh Settlement Agreement, the Court must look

"beyond the unhelpful text and the frustrating difficulty of defining its key

term, and look instead to the objectives" of the Marsh Settlement

Agreement and the Manville Plan.  *Id.* at 656.

This is what the Supreme Court did in Travelers when it leaned

heavily on the extensive factual findings made by the Bankruptcy Court in

determining that the direct claims asserted against Travelers sought to

"recover against Travelers either for supposed wrongdoing in its capacity

as Manville's insurer or for improper use of information that Travelers

obtained from Manville as its insurer." *Travelers*, 557 U.S. at 149.  It was

only able to make this conclusion because the record from the Bankruptcy

Court demonstrated that "Travelers learned virtually everything it knew about asbestos from its relationship with Manville."[4]  *Id.* at 144.

Here, it is undeniable that the overarching purpose of the Manville Plan and the establishment of the Manville Trust was "to provide a means of satisfying *Manville's* ongoing personal injury liability while allowing *Manville* to maximize its value by continuing as a going concern."  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988) (emphasis added).  The focus of the entire case was on resolving claims against *Manville* and others for *Manville's* conduct, not the independent non-derivative misconduct of non-debtor third parties.  To that end, the clear language of the Marsh Settlement Agreement provides that in order for a claim against Marsh to be barred, it must be "relat[ed] to *services … performed by [Marsh] for [Manville]*."  (Marsh Settlement Agreement at 8-9)  It was not sufficient for Marsh to simply show that it had an insurance brokerage

---

[4]   Accordingly, the Supreme Court stated that "the detailed findings of the Bankruptcy Court place[d] the Direct Actions within the terms of the 1986 Orders without pushing the limits" of those orders.  *Id.* at 149.  Nevertheless, the Supreme Court admonished that the 1986 Orders do have limits and cautioned courts against stretching them too far.  *Id.* at 149.

relationship with Manville.  Instead, Marsh must show that its malfeasance (or alleged malfeasance) would have necessarily been performed for Manville exclusively and not related to services performed for another client.  The only way Marsh could show this was by proving that its relationship with Manville was so intertwined that it learned everything about asbestos from Manville and that all of the actions it took were on behalf of Manville.  Marsh did not attempt to make this showing and there is nothing in the record below to establish that the conduct Parra complains of was performed on behalf of Manville.  Accordingly, the record below was insufficient to establish the actions complained of in the Parra Complaint were sufficiently "related to" services Marsh performed on behalf of Manville to be barred by the 1986 Orders.

**B.**     **Faced with a Material Factual Dispute Affecting the Application of the 1986 Orders to Parra's Claims, the Bankruptcy Court Erred When it Denied Parra the Benefit of Discovery and a Full Evidentiary Hearing on the Extent of the Relationship between Marsh and Manville.**

    *1.*    *The Bankruptcy Court's Refusal to Allow Parra to take Discovery and hold a Full Evidentiary Hearing Denied Parra of the Procedural Protections Afforded to Him By the Bankruptcy Code.*

The Bankruptcy Court's Memorandum Decision deprived Parra, a non-Manville asbestos personal injury plaintiff, of the right to proceed with a valuable claim against Marsh without affording Parra any of the protections he was entitled to under the Bankruptcy Code and Rules.  Parra should have been given an opportunity to establish that he could prove his claims against Marsh without reliance on Marsh's insurance broker relationship with Manville.  Parra was deprived of the right to conduct discovery or to put Marsh to its proof in an evidentiary hearing.

Federal Rule of Bankruptcy Procedure 9014 ("***Rule 9014***") requires that in a contested matter the party against whom relief is sought must be given "reasonable notice and an opportunity for hearing."  Fed. R. Bankr. P. 9014(a).  Reasonable notice and an opportunity for hearing is defined in

Section 102(1) of the Bankruptcy Code as requiring "such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). The 2002 Advisory Committee Notes to Rule 9014 state that when a contested matter cannot be decided "without resolving a disputed material issue of fact, *an evidentiary hearing must be held*" and the parties allowed to present testimony in the same manner as they would in an adversary proceeding.  Furthermore, where an issue of critical importance is to be considered and a material factual dispute exists, the parties are entitled to discovery and a full evidentiary hearing, especially where the party against whom relief is sought requests discovery and an evidentiary hearing.  *I.R.S. v. Lange (In re Netal, Inc.)*, 498 B.R. 225, 229 (B.A.P. 8th Cir. 2013) (finding that it was an abuse of discretion to deny the Government the chance to conduct discovery and present evidence when faced with a disputed claim objection); *Mulvania v. I.R.S. (In re Mulvania)*, 241 B.R. 1, 7 (B.A.P. 9th Cir. 1997) (Once a fact question was raised, it was an abuse of discretion to deny discovery to resolve the fact issue).

The question of whether Parra's claims were sufficiently "related to" services Marsh performed for Manville was critical to the determination of whether the claims asserted in Parra's Complaint are barred by the 1986 Orders.  Marsh provided no evidence supporting its contention that it should be treated in the same respect as Travelers.  On the other hand, Parra provided evidence that Marsh's knowledge of the hazards of asbestos predates its relationship with Manville and, unlike Travelers, was obtained from sources other than Manville.

Marsh had relationships with numerous companies who were among the "who's who" of the asbestos industry.  (Exhibit D to Parra's Response). Marsh's clientele included Dow Chemical, Riley Stoker, Foster Wheeler, General Electric, Ruberoid, National Gypsum, Dana, Carborundum, H.B. Fuller, Goodrich, Ford, and others.  While Parra was not afforded the opportunity to conduct adequate discovery in order to explore the full breadth and depth of Marsh's involvement in the asbestos industry, even

the evidence that he possesses shows that, unlike Travelers,[5] Marsh's

knowledge of asbestos predates and goes well beyond its relationship with

Manville. (See Parra's Response at 13-15 and accompanying exhibits).

The mere fact that Manville was one of several clients does not

approach proof that Marsh's asbestos-related activities were so inextricably

intertwined with Manville's to the point that Marsh learned everything

---

[5]  In its briefing before the Bankruptcy Court, Marsh argued that the fact that Marsh had other asbestos clients is irrelevant because the same argument was made with respect to Travelers and the Bankruptcy Court still found that "'Travelers['] knowledge of the hazards of asbestos was derived from its nearly three decade insurance relationship with Manville' and that 'Travelers learned virtually everything it knew about asbestos from its relationship with Manville.'" (Reply Memorandum of Law in Support of Motion for Order Enforcing Confirmation Order and Related Orders at 6, Doc. No. 3927)(quoting *Travelers*, 557 U.S. at 144). This argument, however, ignores the fact that in the *Travelers* litigation, the Bankruptcy "Court was not presented with a scintilla of evidence regarding the scope, duration or intensity of any such relationship" and that this failure to present evidence led the Bankruptcy Court to "conclude[] as a factual matter that Manville was without peer among Travelers insureds and that Travelers learned virtually everything it knew about asbestos from its relationship with Manville." *In re Johns-Manville Corp.*, No. 82-B-11656, 2004 WL 1876046, *13 (Bankr. S.D.N.Y. Aug. 17, 2004). In contrast, Parra submitted evidence and requested the opportunity to uncover additional evidence showing that Marsh's relationship with Manville was not the sole source of its asbestos related knowledge.

that it knows about asbestos from Manville and that all of the actions

complained of in the Parra Complaint were taken on behalf of Manville.

Before barring Parra's claims, the Bankruptcy Court should have required

Marsh to marshal sufficient evidence to prove its entirely unsupported

assertion that that, like Travelers, it learned virtually everything it knew

about asbestos from Manville and therefore, Parra's claims fell within the

purview of the 1986 Orders.  Similarly, Parra should have been given a full

and fair opportunity to rebut this assertion by showing that Marsh

obtained its knowledge of and influence in the asbestos industry from

other sources.  Accordingly, it was error for the Bankruptcy Court to deny

Parra the right to take discovery and refuse to hold an evidentiary hearing.

2. *The Bankruptcy Court Erred when it Concluded that the Allegations in Parra's Complaint are Judicial Admissions Binding on Parra in the Proceedings before the Bankruptcy Court.*

The Bankruptcy Court erred when it held that "Parra is bound by

[the] affirmative allegations in the Complaint, which constitute judicial

admissions" and that it would "not permit Parra to conduct discovery to

investigate – and potentially contradict – matters which he has already

admitted in the Complaint."  (Memorandum Decision at 16).  Judicial

admissions are "formal concessions … by a party or counsel that have the

effect of withdrawing a fact from issue and dispensing wholly with the

need for proof of the fact."  *Hausler v. JP Morgan Chase Bank, N.A.*, No. 09-

CV-10289, --- F. Supp. 3d ---, 2015 WL 5236481, *16 (S.D.N.Y. Aug. 4,

2015)(quoting *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009)).  To qualify

as a judicial admission the statement "must be 'clear and unambiguous

admission[s] of fact'" related to "factual assertions made by one party

concerning matters peculiarly within its knowledge or control, …, as

opposed to facts uniquely known or controlled by an adversary party."

*Hausler*, 2015 WL 5236481 at *16 (quoting *Kregler v. City of New York*, 821 F.

Supp. 2d 651, 656 (S.D.N.Y. 2011) and *Banks v. Yokemick*, 214 F. Supp. 2d

401, 406-07 (S.D.N.Y. 2002)).  Although judicial admissions are binding on a

party throughout the course of the proceeding in which the judicial

admission is made, judicial admissions are not binding in a separate and

subsequent case.  *Hausler*, 2015 WL 5236481 at *16 (quoting *Am. Tissue, Inc.*

*v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004)); *Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001).

The statements made in Parra's Complaint are not judicial admissions. They are allegations of facts that are matters that are not "peculiarly within" Parra's knowledge and control. To the contrary, the nature of and extent of Marsh's relationship with Manville and its other insurance clients is uniquely within the knowledge and control of Marsh. The statements are subject to proof to be supplied at trial and therefore, cannot be judicial admissions. However, even if the statements in Parra's Complaint qualified as judicial admissions, they would only qualify as judicial admissions in the state court litigation in which they were made. They cannot be used as judicial admissions against Parra in this proceeding, as Parra has not made these statements before the Bankruptcy Court. At best, the statements might be considered as evidence before the Bankruptcy Court, but Parra must be permitted to submit other evidence to the Bankruptcy Court. *Hausler*, 2015 WL 5236481 at *16.

Furthermore, the statements in the Parra Complaint do not support the conclusion reached by the Bankruptcy Court.  Nowhere in the Parra Complaint is there an allegation that Marsh gained all of its asbestos related knowledge from Manville.  Nor does the Parra Complaint include "specific and extensive allegations regarding the ways in which Marsh learned information about the health hazards of asbestos exposure from its relationship with Manville."  (Memorandum Decision at 19-20).  Instead, the Parra Complaint describes the services that Marsh provided to Manville purely as an example of the services Marsh provided to its asbestos-related clientele.  That Marsh was in a position to gain knowledge from its relationship with Manville does not establish that Manville was the sole source of Marsh's asbestos-related knowledge, and Marsh has not brought forth any evidence to rebut Parra's assertions that Marsh had its own independent knowledge of asbestos through its own activities and relationships with its other clients.

Barring Parra's suit against Marsh on the scant record before the Bankruptcy Court is inappropriate and works substantial injustice to a

claimant that takes no benefit from the Marsh Settlement, as he currently

has not asserted and may never assert a claim against the Manville Trust.

His claims are against Marsh, not Manville.  If Marsh wants the same

protections afforded to Travelers, it needed to prove that Parra cannot

establish his claims against Marsh without referring to Marsh's relationship

with Manville.  Without this, its defense is nothing more than *"Manville was*

*my client too."*  This bare assertion—standing alone—does not support a

finding that Parra's claims are sufficiently "related to" the services Marsh

performed for Manville to be barred by the 1986 Orders.  By resting its

conclusions on such a flimsy argument, the Bankruptcy Court pushed the

reach of the 1986 Orders far beyond their outer limits.

**C.**   **The Bankruptcy Court's Review of the Record below Led to the Erroneous Conclusion that Para, a non-Manville Asbestos Plaintiff with Asbestos Related Claims Against Marsh for Marsh's Own Independent Actions, Received Adequate Notice That His Non-Derivative Claims Against Marsh Would be Barred by the 1986 Orders.**

No one can dispute that in order for Parra's claims against Marsh to

be barred by the 1986 Orders, Parra must have received constitutionally

sufficient notice that these claims would be barred by the 1986 Orders.

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 138 (2d Cir. 2010).  Due process requires that deprivation of a valuable right such as the right to bring a cause of action against Marsh, must be "preceded by notice and opportunity for hearing appropriate to the nature of the case."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).  The notice must be "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Id.* at 314.

In bankruptcy, due process requires that creditors receive notice of the bar date and the confirmation hearing before their claims may be barred. *See White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689, 708 (Bankr. D. Kan. 2006) (citing *New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293 (1953)); *see also Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) ("Inadequate notice is a defect which *precludes discharge of a claim in bankruptcy*.") (emphasis added).  Furthermore, it is universally acknowledged that unknown future tort claims can be discharged, if at all, only if their holders were adequately represented in

the bankruptcy proceedings.  *See UNR Indus., Inc. v. Walker (In re UNR Indus., Inc.)*, 224 B.R. 664, 672 (Bankr. N.D. Ill. 1998) (surveying existing cases and concluding that "[d]espite the various permutations in fact patterns and reasoning, virtually all the cases conclude that unknown tort claims cannot be discharged and precluded from future recoveries unless their interests have been adequately represented within the bankruptcy proceeding").

In bankruptcy cases involving an asbestos channeling injunction that affects future claims, due process may only be satisfied by the appointment of a future claims representative, charged with protecting the interests of the future asbestos claimants against the debtor.  The Bankruptcy Court recognized this during the 1986 proceedings when it appointed the Manville FCR, *In re Johns-Manville Corp.*, 36 B.R. 743, 756 n. 6 (Bankr. S.D.N.Y. 1984), and Congress has made it clear that a channeling injunction cannot bar the claims asserted by future asbestos claimants, unless "as part of the proceedings leading to the issuance of such injunction, *the court appoints a legal representative for the purpose of protecting the rights of persons*

41

*that might subsequently assert demands*" of the kind to be channeled by the injunction.  11 U.S.C. § 524(g)(4)(B)(emphasis added); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 n. 45 (3d. Cir. 2004) (recognizing that appointment of the future claims representative under section 524(g)(4)(B)(i) is required for due process).  Accordingly, in order for the Manville FCR to stand in the shoes of the future claimants and receive notice on their behalf, with respect to their claims against Marsh for its own independent, non-derivative misconduct, the Manville FCR must have represented the future claimants with respect to those claims in addition to their claims against Manville.  The record does not support such a finding.

The record below is devoid of any evidence to support the Bankruptcy Court's conclusion that the Manville FCR was either charged with or did in fact look out for and protect future claimants' interests as to non-derivative claims against non-debtor third parties.  The fact that the Manville FCR was not prohibited from doing so, or that Parra was in the class of persons represented by the Manville FCR, does not establish that those interests were properly protected.

Indeed, prior decisions of the Manville court make clear that claims

such as Parra's against Marsh were not contemplated during the Manville

bankruptcy.  For instance, in 1986, the Bankruptcy Court stated that the

purpose of the notice campaign surrounding confirmation was "to inform

as many future asbestos claimants as possible of the impact of the Manville

reorganization upon *whatever rights they may have against [Manville]*

and give them a voice in these proceedings."  *In re Johns-Manville Corp.*, 68

B.R. 618, 626 (Bankr. S.D.N.Y. 1986).  The notice campaign did not focus on

the effect confirmation would have on Marsh's liability for its own

independent misconduct.

Similarly, in a 1984 decision, the Manville court stated that "the

Manville reorganization [would] have to be accountable to future asbestos

claimants whose compelling interest must be safeguarded" in any

"meaningful resolution of the *Manville asbestos-related health problem.*"

*In re Johns-Manville Corp.*, 36 B.R. 743, 744 (Bankr. S.D.N.Y. 1984) (emphasis

added).  These statements by the Bankruptcy Court indicate that the court

was concerned with protecting the future claimants' interests in their

43

claims *against Manville* and their ability to recover from Manville for

Manville's asbestos liabilities; not the ability of future claimants to recover

from non-debtor third parties for their own independent asbestos-related

misconduct.

It is undisputed that the Manville FCR was appointed to protect and

represent the interests of "those persons who have been exposed to

asbestos or asbestos products mined, manufactured or supplied by

Manville pre-petition and have manifested or will manifest disease post-

petition and who [were] not otherwise represented" in the Manville

Bankruptcy.  (Order Appointing a Legal Representative for Future

Claimants, Exhibit S to Parra's Response).  Nor is it disputed that the

Manville FCR was given the full powers and duties of a committee under

Section 1103 of the Bankruptcy Code.  What is disputed is whether the

Manville FCR represented these person's interests with respect to non-

derivative third-party claims against parties other than Manville or its

estate. The gravamen of Parra's contention that the *Travelers* decision did

not determine Marsh's fate was that he sought to make Marsh liable for its

own torts, using Manville as a mere example (among many) of Marsh's wide asbestos work.  To claim that the Manville FCR was charged to protect Parra's due process concerns with respect to his claims against Marsh is to stretch the concept way beyond its breaking point.

The Manville FCR was explicitly appointed to represent the future claimants with respect to their claims against Manville.  The Manville FCR was not and could not have been charged with representing future claimants with respect to their claims against any non-debtor third-parties for their own independent conduct.  Neither the Bankruptcy Court, nor Marsh or Travelers, have pointed to any evidence in the record below to show that the Manville FCR was charged with or in fact, did represent the interests of future claimants, such as Parra, with respect to Parra's independent claims against Marsh or others for conduct wholly unrelated to Manville's asbestos-related liabilities.  Because the Manville FCR did not represent Parra's interests in his claims against Marsh, for Marsh's own independent, non-derivative misconduct, the Manville FCR could not stand in Parra's shoes for constitutional due process purposes, and

therefore, Parra's due process rights, with respect to the claims asserted in the Parra Complaint, were not properly protected and Parra should not be bound by the 1986 Orders with respect to those claims.

## VIII.
## CONCLUSION

Because the Bankruptcy Court's cursory review of the issues before it and its refusal to consider evidence outside of the Parra Complaint led to the erroneous conclusion that Marsh's relationship with Manville was sufficient enough for the Bankruptcy Court to determine that the claims asserted in the Parra Complaint are barred by the 1986 Orders, Appellant asks this Court to reverse and remand the case back to the Bankruptcy Court with instructions to allow Parra to conduct additional discovery and hold a full evidentiary hearing on the nature and extent of Marsh's relationship with Manville, or, in the alternative, hold that Parra's claims are not barred by the 1986 Orders.

Dated: October 26, 2015                     Respectfully submitted,

                                            /s/ Peter C. D'Apice
                                            Peter C. D'Apice
                                            Sander L. Esserman
                                            David J. Parsons
                                            Heather J. Panko
                                            STUTZMAN, BROMBERG,
                                            ESSERMAN & PLIFKA,
                                            A Professional Corporation
                                            2323 Bryan Street, Suite 2200
                                            Dallas, Texas  75201
                                            Phone: (214) 969-4900
                                            Facsimile: (214) 969-4999
                                            Email:   d'apice@sbep-law.com
                                                     esserman@sbep-law.com
                                                     parsons@sbep-law.com
                                                     panko@sbep-law.com

                                            **ATTORNEYS FOR THE
                                            BOGDAN LAW FIRM, AS
                                            COUNSEL FOR
                                            SALVADOR PARRA, JR.**

**CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF BANKRUPTCY PROCEDURE 8015
TYPE-VOLUME LIMITATION**

1. This brief complies with the type-volume limitations because this brief contains 8,416 words, excluding parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Civil Procedure 8015(a)(5) and the type style requirements of Federal Rule of Civil Procedure 8015(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Palantino Linotype font.

/s/ *Peter C. D'Apice*

Peter C. D'Apice
STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas  75201
(214) 969-4900

**ATTORNEYS FOR THE
BOGDAN LAW FIRM, AS
COUNSEL FOR
SALVADOR PARRA, JR.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 26th day of October, 2015, a true and correct copy of the foregoing Brief of Appellant The Bogdan Law Firm, as Counsel for Salvador Parra, Jr. was served via the Court's electronic notification system on all parties in this case entitled to receive such service.

*/s/ Peter C. D'Apice*
Peter C. D'Apice

# ADDENDUM

United States Code Annotated
Title 11. Bankruptcy (Refs & Annos)
Chapter 1. General Provisions (Refs & Annos)

11 U.S.C.A. § 102

§ 102. Rules of construction

Currentness

In this title--

**(1)** "after notice and a hearing", or a similar phrase--

**(A)** means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances; but

**(B)** authorizes an act without an actual hearing if such notice is given properly and if--

**(i)** such a hearing is not requested timely by a party in interest; or

**(ii)** there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act;

**(2)** "claim against the debtor" includes claim against property of the debtor;

**(3)** "includes" and "including" are not limiting;

**(4)** "may not" is prohibitive, and not permissive;

**(5)** "or" is not exclusive;

**(6)** "order for relief" means entry of an order for relief;

**(7)** the singular includes the plural;

**(8)** a definition, contained in a section of this title that refers to another section of this title, does not, for the purpose of such reference, affect the meaning of a term used in such other section; and

**(9)** "United States trustee" includes a designee of the United States trustee.

**CREDIT(S)**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2554; Pub.L. 98-353, Title III, § 422, July 10, 1984, 98 Stat. 369; Pub.L. 99-554, Title II, § 202, Oct. 27, 1986, 100 Stat. 3097.)

Notes of Decisions (58)

11 U.S.C.A. § 102, 11 USCA § 102
Current through P.L. 114-51 approved 9-24-2015

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

🟨 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
            Subchapter II. Debtor's Duties and Benefits

11 U.S.C.A. § 524

§ 524. Effect of discharge

Effective: December 22, 2010
Currentness

**(a)** A discharge in a case under this title--

**(1)** voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;

**(2)** operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and

**(3)** operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523, 1228(a)(1), or 1328(a)(1), or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

**(b)** Subsection (a)(3) of this section does not apply if--

**(1)(A)** the debtor's spouse is a debtor in a case under this title, or a bankrupt or a debtor in a case under the Bankruptcy Act, commenced within six years of the date of the filing of the petition in the case concerning the debtor; and

**(B)** the court does not grant the debtor's spouse a discharge in such case concerning the debtor's spouse; or

**(2)(A)** the court would not grant the debtor's spouse a discharge in a case under chapter 7 of this title concerning such spouse commenced on the date of the filing of the petition in the case concerning the debtor; and

**(B)** a determination that the court would not so grant such discharge is made by the bankruptcy court within the time and in the manner provided for a determination under section 727 of this title of whether a debtor is granted a discharge.

**(c)** An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if--

**(1)** such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;

**(2)** the debtor received the disclosures described in subsection (k) at or before the time at which the debtor signed the agreement;

**(3)** such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that--

    **(A)** such agreement represents a fully informed and voluntary agreement by the debtor;

    **(B)** such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and

    **(C)** the attorney fully advised the debtor of the legal effect and consequences of--

        **(i)** an agreement of the kind specified in this subsection; and

        **(ii)** any default under such an agreement;

**(4)** the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;

**(5)** the provisions of subsection (d) of this section have been complied with; and

**(6)(A)** in a case concerning an individual who was not represented by an attorney during the course of negotiating an agreement under this subsection, the court approves such agreement as--

    **(i)** not imposing an undue hardship on the debtor or a dependent of the debtor; and

    **(ii)** in the best interest of the debtor.

**(B)** Subparagraph (A) shall not apply to the extent that such debt is a consumer debt secured by real property.

**(d)** In a case concerning an individual, when the court has determined whether to grant or not to grant a discharge under section 727, 1141, 1228, or 1328 of this title, the court may hold a hearing at which the debtor shall appear in person. At any such hearing, the court shall inform the debtor that a discharge has been granted or the reason why a discharge has not been granted. If a discharge has been granted and if the debtor desires to make an agreement of the kind specified in subsection (c) of this section and was not represented by an attorney during the course of negotiating such agreement, then the court shall hold a hearing at which the debtor shall appear in person and at such hearing the court shall--

    **(1)** inform the debtor--

        **(A)** that such an agreement is not required under this title, under nonbankruptcy law, or under any agreement not made in accordance with the provisions of subsection (c) of this section; and

        **(B)** of the legal effect and consequences of--

            **(i)** an agreement of the kind specified in subsection (c) of this section; and

            **(ii)** a default under such an agreement; and

    **(2)** determine whether the agreement that the debtor desires to make complies with the requirements of subsection (c)(6) of this section, if the consideration for such agreement is based in whole or in part on a consumer debt that is not secured by real property of the debtor.

**(e)** Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

**(f)** Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt.

**(g)(1)(A)** After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.

**(B)** An injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i), except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization.

**(2)(A)** Subject to subsection (h), if the requirements of subparagraph (B) are met at the time an injunction described in paragraph (1) is entered, then after entry of such injunction, any proceeding that involves the validity, application, construction, or modification of such injunction, or of this subsection with respect to such injunction, may be commenced only in the district

court in which such injunction was entered, and such court shall have exclusive jurisdiction over any such proceeding without regard to the amount in controversy.

**(B)** The requirements of this subparagraph are that--

  **(i)** the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization--

    **(I)** is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

    **(II)** is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;

    **(III)** is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of--

      **(aa)** each such debtor;

      **(bb)** the parent corporation of each such debtor; or

      **(cc)** a subsidiary of each such debtor that is also a debtor; and

    **(IV)** is to use its assets or income to pay claims and demands; and

  **(ii)** subject to subsection (h), the court determines that--

    **(I)** the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;

    **(II)** the actual amounts, numbers, and timing of such future demands cannot be determined;

    **(III)** pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands;

    **(IV)** as part of the process of seeking confirmation of such plan--

**(aa)** the terms of the injunction proposed to be issued under paragraph (1)(A), including any provisions barring actions against third parties pursuant to paragraph (4)(A), are set out in such plan and in any disclosure statement supporting the plan; and

**(bb)** a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and

**(V)** subject to subsection (h), pursuant to court orders or otherwise, the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

**(3)(A)** If the requirements of paragraph (2)(B) are met and the order confirming the plan of reorganization was issued or affirmed by the district court that has jurisdiction over the reorganization case, then after the time for appeal of the order that issues or affirms the plan--

**(i)** the injunction shall be valid and enforceable and may not be revoked or modified by any court except through appeal in accordance with paragraph (6);

**(ii)** no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and

**(iii)** no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason;

**(B)** Subparagraph (A) shall not be construed to--

**(i)** imply that an entity described in subparagraph (A)(ii) or (iii) would, if this paragraph were not applicable, necessarily be liable to any entity by reason of any of the acts described in subparagraph (A);

**(ii)** relieve any such entity of the duty to comply with, or of liability under, any Federal or State law regarding the making of a fraudulent conveyance in a transaction described in subparagraph (A)(ii) or (iii); or

**(iii)** relieve a debtor of the debtor's obligation to comply with the terms of the plan of reorganization, or affect the power of the court to exercise its authority under sections 1141 and 1142 to compel the debtor to do so.

**(4)(A)(i)** Subject to subparagraph (B), an injunction described in paragraph (1) shall be valid and enforceable against all entities that it addresses.

**(ii)** Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of--

> **(I)** the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

> **(II)** the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

> **(III)** the third party's provision of insurance to the debtor or a related party; or

> **(IV)** the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to--

>> **(aa)** involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

>> **(bb)** acquiring or selling a financial interest in an entity as part of such a transaction.

**(iii)** As used in this subparagraph, the term "related party" means--

> **(I)** a past or present affiliate of the debtor;

> **(II)** a predecessor in interest of the debtor; or

> **(III)** any entity that owned a financial interest in--

>> **(aa)** the debtor;

>> **(bb)** a past or present affiliate of the debtor; or

>> **(cc)** a predecessor in interest of the debtor.

**(B)** Subject to subsection (h), if, under a plan of reorganization, a kind of demand described in such plan is to be paid in whole or in part by a trust described in paragraph (2)(B)(i) in connection with which an injunction described in paragraph (1) is to be

implemented, then such injunction shall be valid and enforceable with respect to a demand of such kind made, after such plan is confirmed, against the debtor or debtors involved, or against a third party described in subparagraph (A)(ii), if--

    **(i)** as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind, and

    **(ii)** the court determines, before entering the order confirming such plan, that identifying such debtor or debtors, or such third party (by name or as part of an identifiable group), in such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party.

**(5)** In this subsection, the term "demand" means a demand for payment, present or future, that--

    **(A)** was not a claim during the proceedings leading to the confirmation of a plan of reorganization;

    **(B)** arises out of the same or similar conduct or events that gave rise to the claims addressed by the injunction issued under paragraph (1); and

    **(C)** pursuant to the plan, is to be paid by a trust described in paragraph (2)(B)(i).

**(6)** Paragraph (3)(A)(i) does not bar an action taken by or at the direction of an appellate court on appeal of an injunction issued under paragraph (1) or of the order of confirmation that relates to the injunction.

**(7)** This subsection does not affect the operation of section 1144 or the power of the district court to refer a proceeding under section 157 of title 28 or any reference of a proceeding made prior to the date of the enactment of this subsection.

**(h) Application to existing injunctions.**--For purposes of subsection (g)--

**(1)** subject to paragraph (2), if an injunction of the kind described in subsection (g)(1)(B) was issued before the date of the enactment of this Act, as part of a plan of reorganization confirmed by an order entered before such date, then the injunction shall be considered to meet the requirements of subsection (g)(2)(B) for purposes of subsection (g)(2)(A), and to satisfy subsection (g)(4)(A)(ii), if--

    **(A)** the court determined at the time the plan was confirmed that the plan was fair and equitable in accordance with the requirements of section 1129(b);

    **(B)** as part of the proceedings leading to issuance of such injunction and confirmation of such plan, the court had appointed a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands described in subsection (g)(4)(B) with respect to such plan; and

**(C)** such legal representative did not object to confirmation of such plan or issuance of such injunction; and

**(2)** for purposes of paragraph (1), if a trust described in subsection (g)(2)(B)(i) is subject to a court order on the date of the enactment of this Act staying such trust from settling or paying further claims--

**(A)** the requirements of subsection (g)(2)(B)(ii)(V) shall not apply with respect to such trust until such stay is lifted or dissolved; and

**(B)** if such trust meets such requirements on the date such stay is lifted or dissolved, such trust shall be considered to have met such requirements continuously from the date of the enactment of this Act.

**(i)** The willful failure of a creditor to credit payments received under a plan confirmed under this title, unless the order confirming the plan is revoked, the plan is in default, or the creditor has not received payments required to be made under the plan in the manner required by the plan (including crediting the amounts required under the plan), shall constitute a violation of an injunction under subsection (a)(2) if the act of the creditor to collect and failure to credit payments in the manner required by the plan caused material injury to the debtor.

**(j)** Subsection (a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if--

**(1)** such creditor retains a security interest in real property that is the principal residence of the debtor;

**(2)** such act is in the ordinary course of business between the creditor and the debtor; and

**(3)** such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

**(k)(1)** The disclosures required under subsection (c)(2) shall consist of the disclosure statement described in paragraph (3), completed as required in that paragraph, together with the agreement specified in subsection (c), statement, declaration, motion and order described, respectively, in paragraphs (4) through (8), and shall be the only disclosures required in connection with entering into such agreement.

**(2)** Disclosures made under paragraph (1) shall be made clearly and conspicuously and in writing. The terms "Amount Reaffirmed" and "Annual Percentage Rate" shall be disclosed more conspicuously than other terms, data or information provided in connection with this disclosure, except that the phrases "Before agreeing to reaffirm a debt, review these important disclosures" and "Summary of Reaffirmation Agreement" may be equally conspicuous. Disclosures may be made in a different order and may use terminology different from that set forth in paragraphs (2) through (8), except that the terms "Amount Reaffirmed" and "Annual Percentage Rate" must be used where indicated.

**(3)** The disclosure statement required under this paragraph shall consist of the following:

**(A)** The statement: "Part A: Before agreeing to reaffirm a debt, review these important disclosures:";

**(B)** Under the heading "Summary of Reaffirmation Agreement", the statement: "This Summary is made pursuant to the requirements of the Bankruptcy Code";

**(C)** The "Amount Reaffirmed", using that term, which shall be--

  **(i)** the total amount of debt that the debtor agrees to reaffirm by entering into an agreement of the kind specified in subsection (c), and

  **(ii)** the total of any fees and costs accrued as of the date of the disclosure statement, related to such total amount.

**(D)** In conjunction with the disclosure of the "Amount Reaffirmed", the statements--

  **(i)** "The amount of debt you have agreed to reaffirm"; and

  **(ii)** "Your credit agreement may obligate you to pay additional amounts which may come due after the date of this disclosure. Consult your "'credit agreement.".

**(E)** The "Annual Percentage Rate", using that term, which shall be disclosed as--

  **(i)** if, at the time the petition is filed, the debt is an extension of credit under an open end credit plan, as the terms "credit" and "open end credit plan" are defined in section 103 of the Truth in Lending Act, then--

    **(I)** the annual percentage rate determined under paragraphs (5) and (6) of section 127(b) of the Truth in Lending Act, as applicable, as disclosed to the debtor in the most recent periodic statement prior to entering into an agreement of the kind specified in subsection (c) or, if no such periodic statement has been given to the debtor during the prior 6 months, the annual percentage rate as it would have been so disclosed at the time the disclosure statement is given to the debtor, or to the extent this annual percentage rate is not readily available or not applicable, then

    **(II)** the simple interest rate applicable to the amount reaffirmed as of the date the disclosure statement is given to the debtor, or if different simple interest rates apply to different balances, the simple interest rate applicable to each such balance, identifying the amount of each such balance included in the amount reaffirmed, or

    **(III)** if the entity making the disclosure elects, to disclose the annual percentage rate under subclause (I) and the simple interest rate under subclause (II); or

  **(ii)** if, at the time the petition is filed, the debt is an extension of credit other than under an open end credit plan, as the terms "credit" and "open end credit plan" are defined in section 103 of the Truth in Lending Act, then--

**(I)** the annual percentage rate under section 128(a)(4) of the Truth in Lending Act, as disclosed to the debtor in the most recent disclosure statement given to the debtor prior to the entering into an agreement of the kind specified in subsection (c) with respect to the debt, or, if no such disclosure statement was given to the debtor, the annual percentage rate as it would have been so disclosed at the time the disclosure statement is given to the debtor, or to the extent this annual percentage rate is not readily available or not applicable, then

**(II)** the simple interest rate applicable to the amount reaffirmed as of the date the disclosure statement is given to the debtor, or if different simple interest rates apply to different balances, the simple interest rate applicable to each such balance, identifying the amount of such balance included in the amount reaffirmed, or

**(III)** if the entity making the disclosure elects, to disclose the annual percentage rate under (I) and the simple interest rate under (II).

**(F)** If the underlying debt transaction was disclosed as a variable rate transaction on the most recent disclosure given under the Truth in Lending Act, by stating "The interest rate on your loan may be a variable interest rate which changes from time to time, so that the annual percentage rate disclosed here may be higher or lower."

**(G)** If the debt is secured by a security interest which has not been waived in whole or in part or determined to be void by a final order of the court at the time of the disclosure, by disclosing that a security interest or lien in goods or property is asserted over some or all of the debts the debtor is reaffirming and listing the items and their original purchase price that are subject to the asserted security interest, or if not a purchase-money security interest then listing by items or types and the original amount of the loan.

**(H)** At the election of the creditor, a statement of the repayment schedule using 1 or a combination of the following--

**(i)** by making the statement: "Your first payment in the amount of $___ is due on ___ but the future payment amount may be different. Consult your reaffirmation agreement or credit agreement, as applicable.", and stating the amount of the first payment and the due date of that payment in the places provided;

**(ii)** by making the statement: "Your payment schedule will be:", and describing the repayment schedule with the number, amount, and due dates or period of payments scheduled to repay the debts reaffirmed to the extent then known by the disclosing party; or

**(iii)** by describing the debtor's repayment obligations with reasonable specificity to the extent then known by the disclosing party.

**(I)** The following statement: "Note: When this disclosure refers to what a creditor 'may' do, it does not use the word 'may' to give the creditor specific permission. The word 'may' is used to tell you what might occur if the law permits the creditor to take the action. If you have questions about your reaffirming a debt or what the law requires, consult with the attorney who helped you negotiate this agreement reaffirming a debt. If you don't have an attorney helping you, the judge will explain the effect of your reaffirming a debt when the hearing on the reaffirmation agreement is held.".

**(J)(i)** The following additional statements:

"Reaffirming a debt is a serious financial decision. The law requires you to take certain steps to make sure the decision is in your best interest. If these steps are not completed, the reaffirmation agreement is not effective, even though you have signed it.

"1. Read the disclosures in this Part A carefully. Consider the decision to reaffirm carefully. Then, if you want to reaffirm, sign the reaffirmation agreement in Part B (or you may use a separate agreement you and your creditor agree on).

"2. Complete and sign Part D and be sure you can afford to make the payments you are agreeing to make and have received a copy of the disclosure statement and a completed and signed reaffirmation agreement.

"3. If you were represented by an attorney during the negotiation of your reaffirmation agreement, the attorney must have signed the certification in Part C.

"4. If you were not represented by an attorney during the negotiation of your reaffirmation agreement, you must have completed and signed Part E.

"5. The original of this disclosure must be filed with the court by you or your creditor. If a separate reaffirmation agreement (other than the one in Part B) has been signed, it must be attached.

"6. If you were represented by an attorney during the negotiation of your reaffirmation agreement, your reaffirmation agreement becomes effective upon filing with the court unless the reaffirmation is presumed to be an undue hardship as explained in Part D.

"7. If you were not represented by an attorney during the negotiation of your reaffirmation agreement, it will not be effective unless the court approves it. The court will notify you of the hearing on your reaffirmation agreement. You must attend this hearing in bankruptcy court where the judge will review your reaffirmation agreement. The bankruptcy court must approve your reaffirmation agreement as consistent with your best interests, except that no court approval is required if your reaffirmation agreement is for a consumer debt secured by a mortgage, deed of trust, security deed, or other lien on your real property, like your home.

"Your right to rescind (cancel) your reaffirmation agreement. You may rescind (cancel) your reaffirmation agreement at any time before the bankruptcy court enters a discharge order, or before the expiration of the 60-day period that begins on the date your reaffirmation agreement is filed with the court, whichever occurs later. To rescind (cancel) your reaffirmation agreement, you must notify the creditor that your reaffirmation agreement is rescinded (or canceled).

"What are your obligations if you reaffirm the debt? A reaffirmed debt remains your personal legal obligation. It is not discharged in your bankruptcy case. That means that if you default on your reaffirmed debt after your bankruptcy case is over, your creditor may be able to take your property or your wages. Otherwise, your obligations will be determined by the reaffirmation agreement which may have changed the terms of the original agreement. For example, if you are reaffirming an open end credit agreement, the creditor may be permitted by that agreement or applicable law to change the terms of that agreement in the future under certain conditions.

"Are you required to enter into a reaffirmation agreement by any law? No, you are not required to reaffirm a debt by any law. Only agree to reaffirm a debt if it is in your best interest. Be sure you can afford the payments you agree to make.

"What if your creditor has a security interest or lien? Your bankruptcy discharge does not eliminate any lien on your property. A 'lien' is often referred to as a security interest, deed of trust, mortgage or security deed. Even if you do not reaffirm and

your personal liability on the debt is discharged, because of the lien your creditor may still have the right to take the property securing the lien if you do not pay the debt or default on it. If the lien is on an item of personal property that is exempt under your State's law or that the trustee has abandoned, you may be able to redeem the item rather than reaffirm the debt. To redeem, you must make a single payment to the creditor equal to the amount of the allowed secured claim, as agreed by the parties or determined by the court.".

(ii) In the case of a reaffirmation under subsection (m)(2), numbered paragraph 6 in the disclosures required by clause (i) of this subparagraph shall read as follows:

"6. If you were represented by an attorney during the negotiation of your reaffirmation agreement, your reaffirmation agreement becomes effective upon filing with the court.".

(4) The form of such agreement required under this paragraph shall consist of the following:

"Part B: Reaffirmation Agreement. I (we) agree to reaffirm the debts arising under the credit agreement described below.

"Brief description of credit agreement:

"Description of any changes to the credit agreement made as part of this reaffirmation agreement:

"Signature: Date:

"Borrower:

"Co-borrower, if also reaffirming these debts:

"Accepted by creditor:

"Date of creditor acceptance:".

(5) The declaration shall consist of the following:

(A) The following certification:

"Part C: Certification by Debtor's Attorney (If Any).

"I hereby certify that (1) this agreement represents a fully informed and voluntary agreement by the debtor; (2) this agreement does not impose an undue hardship on the debtor or any dependent of the debtor; and (3) I have fully advised the debtor of the legal effect and consequences of this agreement and any default under this agreement.

"Signature of Debtor's Attorney: Date:".

(B) If a presumption of undue hardship has been established with respect to such agreement, such certification shall state that, in the opinion of the attorney, the debtor is able to make the payment.

**(C)** In the case of a reaffirmation agreement under subsection (m)(2), subparagraph (B) is not applicable.

**(6)(A)** The statement in support of such agreement, which the debtor shall sign and date prior to filing with the court, shall consist of the following:

"Part D: Debtor's Statement in Support of Reaffirmation Agreement.

"1. I believe this reaffirmation agreement will not impose an undue hardship on my dependents or me. I can afford to make the payments on the reaffirmed debt because my monthly income (take home pay plus any other income received) is $___, and my actual current monthly expenses including monthly payments on post-bankruptcy debt and other reaffirmation agreements total $___, leaving $___ to make the required payments on this reaffirmed debt. I understand that if my income less my monthly expenses does not leave enough to make the payments, this reaffirmation agreement is presumed to be an undue hardship on me and must be reviewed by the court. However, this presumption may be overcome if I explain to the satisfaction of the court how I can afford to make the payments here: ___.

"2. I received a copy of the Reaffirmation Disclosure Statement in Part A and a completed and signed reaffirmation agreement.".

**(B)** Where the debtor is represented by an attorney and is reaffirming a debt owed to a creditor defined in section 19(b)(1)(A)(iv) of the Federal Reserve Act, the statement of support of the reaffirmation agreement, which the debtor shall sign and date prior to filing with the court, shall consist of the following:

"I believe this reaffirmation agreement is in my financial interest. I can afford to make the payments on the reaffirmed debt. I received a copy of the Reaffirmation Disclosure Statement in Part A and a completed and signed reaffirmation agreement.".

**(7)** The motion that may be used if approval of such agreement by the court is required in order for it to be effective, shall be signed and dated by the movant and shall consist of the following:

"Part E: Motion for Court Approval (To be completed only if the debtor is not represented by an attorney.). I (we), the debtor(s), affirm the following to be true and correct:

"I am not represented by an attorney in connection with this reaffirmation agreement.

"I believe this reaffirmation agreement is in my best interest based on the income and expenses I have disclosed in my Statement in Support of this reaffirmation agreement, and because (provide any additional relevant reasons the court should consider):

"Therefore, I ask the court for an order approving this reaffirmation agreement."

**(8)** The court order, which may be used to approve such agreement, shall consist of the following:

"Court Order: The court grants the debtor's motion and approves the reaffirmation agreement described above.".

**(l)** Notwithstanding any other provision of this title the following shall apply:

**(1)** A creditor may accept payments from a debtor before and after the filing of an agreement of the kind specified in subsection (c) with the court.

**(2)** A creditor may accept payments from a debtor under such agreement that the creditor believes in good faith to be effective.

**(3)** The requirements of subsections (c)(2) and (k) shall be satisfied if disclosures required under those subsections are given in good faith.

**(m)(1)** Until 60 days after an agreement of the kind specified in subsection (c) is filed with the court (or such additional period as the court, after notice and a hearing and for cause, orders before the expiration of such period), it shall be presumed that such agreement is an undue hardship on the debtor if the debtor's monthly income less the debtor's monthly expenses as shown on the debtor's completed and signed statement in support of such agreement required under subsection (k)(6)(A) is less than the scheduled payments on the reaffirmed debt. This presumption shall be reviewed by the court. The presumption may be rebutted in writing by the debtor if the statement includes an explanation that identifies additional sources of funds to make the payments as agreed upon under the terms of such agreement. If the presumption is not rebutted to the satisfaction of the court, the court may disapprove such agreement. No agreement shall be disapproved without notice and a hearing to the debtor and creditor, and such hearing shall be concluded before the entry of the debtor's discharge.

**(2)** This subsection does not apply to reaffirmation agreements where the creditor is a credit union, as defined in section 19(b)(1)(A)(iv) of the Federal Reserve Act.

**CREDIT(S)**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2592; Pub.L. 98-353, Title III, §§ 308, 455, July 10, 1984, 98 Stat. 354, 376; Pub.L. 99-554, Title II, §§ 257(o), 282, 283(k), Oct. 27, 1986, 100 Stat. 3115-3117; Pub.L. 103-394, Title I, §§ 103, 111(a), Title V, § 501(d)(14), Oct. 22, 1994, 108 Stat. 4108, 4113, 4145; Pub.L. 109-8, Title II, §§ 202, 203(a), Title XII, § 1210, Apr. 20, 2005, 119 Stat. 43, 194; Pub.L. 111-327, § 2(a)(19), Dec. 22, 2010, 124 Stat. 3559.)

Notes of Decisions (1162)

11 U.S.C.A. § 524, 11 USCA § 524
Current through P.L. 114-51 approved 9-24-2015

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
   Federal Rules of Bankruptcy Procedure (Refs & Annos)
      Part IX. General Provisions

Federal Rules of Bankruptcy Procedure, Rule 9014

Rule 9014. Contested Matters

Currentness

**(a) Motion.** In a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought. No response is required under this rule unless the court directs otherwise.

**(b) Service.** The motion shall be served in the manner provided for service of a summons and complaint by Rule 7004 and within the time determined under Rule 9006(d). Any written response to the motion shall be served within the time determined under Rule 9006(d). Any paper served after the motion shall be served in the manner provided by Rule 5(b) F. R. Civ. P.

**(c) Application of Part VII rules.** Except as otherwise provided in this rule, and unless the court directs otherwise, the following rules shall apply: 7009, 7017, 7021, 7025, 7026, 7028-7037, 7041, 7042, 7052, 7054-7056, 7064, 7069, and 7071. The following subdivisions of Fed. R. Civ. P. 26, as incorporated by Rule 7026, shall not apply in a contested matter unless the court directs otherwise: 26(a)(1) (mandatory disclosure), 26(a)(2) (disclosures regarding expert testimony) and 26(a)(3) (additional pre-trial disclosure), and 26(f) (mandatory meeting before scheduling conference/discovery plan). An entity that desires to perpetuate testimony may proceed in the same manner as provided in Rule 7027 for the taking of a deposition before an adversary proceeding. The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply. The court shall give the parties notice of any order issued under this paragraph to afford them a reasonable opportunity to comply with the procedures prescribed by the order.

**(d) Testimony of witnesses.** Testimony of witnesses with respect to disputed material factual issues shall be taken in the same manner as testimony in an adversary proceeding.

**(e) Attendance of witnesses.** The court shall provide procedures that enable parties to ascertain at a reasonable time before any scheduled hearing whether the hearing will be an evidentiary hearing at which witnesses may testify.

**CREDIT(S)**
   (As amended Mar. 30, 1987, eff. Aug. 1, 1987; Apr. 26, 1999, eff. Dec. 1, 1999; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 26, 2004, eff. Dec. 1, 2004; Apr. 16, 2013, eff. Dec. 1, 2013.)

**ADVISORY COMMITTEE NOTES**
Rules 1017(d), 3020(b)(1), 4001(a), 4003(d), and 6006(a), which govern respectively dismissal or conversion of a case, objections to confirmation of a plan, relief from the automatic stay and the use of cash collateral, avoidance of a lien under § 522(f) of the Code, and the assumption or rejection of executory contracts or unexpired leases, specifically provide that litigation under those rules shall be as provided in Rule 9014. This rule also governs litigation in other contested matters.

Whenever there is an actual dispute, other than an adversary proceeding, before the bankruptcy court, the litigation to resolve that dispute is a contested matter. For example, the filing of an objection to a proof of claim, to a claim of exemption, or to a disclosure statement creates a dispute which is a contested matter. Even when an objection is not formally required, there may be a dispute. If a party in interest opposes the amount of compensation sought by a professional, there is a dispute which is a contested matter.

When the rules of Part VII are applicable to a contested matter, reference in the Part VII rules to adversary proceedings is to be read as a reference to a contested matter. See Rule 9002(1).

1999 Amendments

This rule is amended to delete Rule 7062 from the list of Part VII rules that automatically apply in a contested matter.

Rule 7062 provides that Rule 62 F.R.Civ.P., which governs stays of proceedings to enforce a judgment, is applicable in adversary proceedings. The provisions of Rule 62, including the ten-day automatic stay of the enforcement of a judgment provided by Rule 62(a) and the stay as a matter of right by posting a supersedeas bond provided in Rule 62(d), are not appropriate for most orders granting or denying motions governed by Rule 9014.

Although Rule 7062 will not apply automatically in contested matters, the amended rule permits the court, in its discretion, to order that Rule 7062 apply in a particular matter, and Rule 8005 gives the court discretion to issue a stay or any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest. In addition, amendments to Rules 3020, 4001, 6004, and 6006 automatically stay certain types of orders for a period of ten days, unless the court orders otherwise.

**GAP Report on Rule 9014**. No changes since publication.

2002 Amendments

The list of Part VII rules that are applicable in a contested matter is extended to include Rule 7009 on pleading special matters, and Rule 7017 on real parties in interest, infants and incompetent persons, and capacity. The discovery rules made applicable in adversary proceedings apply in contested matters unless the court directs otherwise.

**Subdivision (b)** is amended to permit parties to serve papers, other than the original motion, in the manner provided in Rule 5(b) F. Civ.P. When the court requires a response to the motion, this amendment will permit service of the response in the same manner as an answer is served in an adversary proceeding.

**Subdivision (d)** is added to clarify that if the motion cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing must be held at which testimony of witnesses is taken in the same manner as testimony is taken in an adversary proceeding or at a trial in a district court civil case. Rule 43(a), rather than Rule 43(e), F.R. Civ.P. would govern the evidentiary hearing on the factual dispute. Under Rule 9017, the Federal Rules of Evidence also apply in a contested matter. Nothing in the rule prohibits a court from resolving any matter that is submitted on affidavits by agreement of the parties.

**Subdivision (e).** Local procedures for hearings and other court appearances in a contested matter vary from district to district. In some bankruptcy courts, an evidentiary hearing at which witnesses may testify usually is held at the first court appearance in the contested matter. In other courts, it is customary for the court to delay the evidentiary hearing on disputed factual issues until some time after the initial hearing date. In order to avoid unnecessary expense and inconvenience, it is important for attorneys to know whether they should bring witnesses to a court appearance. The purpose of the final sentence of this rule is to require that the court provide a mechanism that will enable attorneys to know at a reasonable time before a scheduled hearing whether it will be necessary for witnesses to appear in court on that particular date.

Case 1:15-cv-06607-SAS   Document 9   Filed 10/26/15   Page 77 of 77

Other amendments to this rule are stylistic.

**Changes Made After Publication and Comments.** The Advisory Committee made two changes to subdivision (d) after considering the comments received addressing the proposed rule. First, the word "material" is inserted to make explicit that which was implied in the published version of the proposed rule. Second, the reference to F.R.Civ.P. 43(a) was removed. The purpose of proposed subdivision (d) was to recognize that testimony should be taken in the same manner in both contested matters and adversary proceedings. The revision to the published rule states this more directly.

The Committee Note was amended to reflect the changes made in the text of the rule.

2004 Amendments

The rule is amended to provide that the mandatory disclosure requirements of Fed. R. Civ. P. 26, as incorporated by Rule 7026, do not apply in contested matters. The typically short time between the commencement and resolution of most contested matters makes the mandatory disclosure provisions of Rule 26 ineffective. Nevertheless, the court may by local rule or by order in a particular case provide that these provisions of the rule apply in a contested matter.

2013 Amendments

A cross-reference to Rule 9006(d) is added to subdivision (b) to call attention to the time limits for the service of motions, supporting affidavits, and written responses to motions. Rule 9006(d) prescribes time limits that apply unless other limits are fixed by these rules, a court order, or a local rule.

**Changes Made After Publication and Comments.** No changes were made.

Notes of Decisions (86)

Fed.Rules Bankr.Proc. Rule 9014, 11 U.S.C.A., FRBP Rule 9014
Including Amendments Received Through 7-1-15

---

**End of Document**                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.