USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/14/16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

**In re**

**JOHNS-MANVILLE CORPORATION,**

          **Debtor.**

----------------------------------------------------------------X

**THE BOGDAN LAW FIRM, AS COUNSEL**
**FOR SALVADOR PARRA, JR.,**

              **Appellant,**

        **v.**

**MARSH USA, INC.,**

              **Appellee.**

----------------------------------------------------------------X

**OPINION AND ORDER**

**Appeal arising from Case
No. 82-B-11656 (CGM)**

**15-cv-06607 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Salvador J. Parra, Jr. ("Parra") developed asbestosis and other

conditions after he was exposed to asbestos while working as an insulator in the

1960s and 1970s.  In 2009, he sued Marsh USA, Inc. ("Marsh"), an insurance

broker, and others alleging that they had conspired with asbestos producers,

distributors, and insurers to withhold information from the public regarding the

1

dangers of asbestos inhalation. In response, Marsh filed a motion in the chapter 11 bankruptcy cases of the Johns-Manville Corporation ("Manville"), arguing that it had been relieved of any liability for Parra's claims by the release and channeling injunction contained in the order confirming Manville's chapter 11 plan.

The bankruptcy court issued a memorandum decision and accompanying order granting Marsh's motion (the "July Order").[1] Parra now appeals from the July Order. For the reasons set forth below, the July Order is AFFIRMED in part, REVERSED in part, and REMANDED to the bankruptcy court for further proceedings consistent with this Opinion and Order.[2]

---

[1] *See In re Johns-Manville Corp.*, 534 B.R. 553 (Bankr. S.D.N.Y. 2015). Bankruptcy Judge Burton Lifland presided over the chapter 11 cases from the time they were filed in August 1982 until his death in January 2014. Bankruptcy Judge Cecelia G. Morris was then assigned to the case. Judge Morris issued the July Order.

[2] The Travelers Indemnity Company and Travelers Casualty and Surety Company ("Travelers") appeared in the bankruptcy court in support of Marsh's motion as an interested party. Parra listed Travelers as an appellee in his notice of appeal. Travelers was not listed as an appellee on the docket, and Travelers filed an unopposed motion to correct the docket to list Travelers as an appellee or, in the alternative, to permit Travelers to appear as an interested party. I granted Travelers' motion to correct the docket. *See* Dkt. No. 7. I now vacate that order and grant the alternative relief of permitting Travelers to appear as an interested party. As Travelers' argues, the rulings in the July Order and this Opinion and Order could not apply to Travelers because Travelers' rights have already been litigated in the Manville proceedings. *See* Brief of Appellees the Travelers Indemnity Company and Travelers Casualty and Surety Company at 14-15.

## I.     BACKGROUND

### A.     The Manville Bankruptcy and the 1986 Orders

"From the 1920s to the 1970s, Manville was, by most accounts, the largest supplier of raw asbestos and manufacturer of asbestos-containing products in the United States, and for much of that time Travelers was Manville's primary liability insurer."[3]  Marsh served as Manville's primary insurance broker from 1944 until 1982.  Travelers' first Manville policy was issued in 1947.[4]  "In 1982, after asbestos-related health problems triggered litigation, Manville, faced with the prospect of tremendous liability, filed a Chapter 11 petition for bankruptcy protection and reorganization."[5]

Manville sued Marsh, alleging that it failed to procure sufficient insurance coverage.  Travelers and other insurers were involved in a

---

[3]     *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 140 (2009).

[4]     *See In re Johns-Manville Corp.*, No. 82-11656, 2004 WL 1876046, at *5 (Bankr. S.D.N.Y. Aug. 17, 2004) ("*Manville I*"), *aff'd in part, vacated in part*, 340 B.R. 49 (S.D.N.Y. 2006) ("*Manville II*"), *vacated*, 517 F.3d 52 (2d Cir. 2008) ("*Manville III*"), *rev'd and remanded sub nom.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 ("*Bailey*"), and *aff'd in part, rev'd in part and remanded sub nom.*, *Travelers Cas. and Sur. Co. v. Chubb Indem. Ins. Co.*, 600 F.3d 135 (2d Cir. 2010) ("*Chubb*").

[5]     *In re Johns-Manville Corp.*, 759 F.3d 206, 209 (2d Cir. 2014).

policy-coverage dispute with Manville, and contribution, indemnity, and cross claims were asserted among the insurers.  Asbestos plaintiffs filed suits against Travelers and other insurers based on the insurers' relationships with Manville.

On May 25, 1984, Manville announced that it had agreed in principle to a settlement of its insurance coverage disputes.  Soon after the announcement, Manville and a group of insurers, executed a settlement agreement (the "1984 Insurance Settlement Agreement").[6]  Notably, Marsh was not a party to the 1984 Insurance Settlement Agreement.  In August 1984, the bankruptcy court appointed a future claims representative ("FCR") to represent future asbestos claimants whose interest in the Manville Chapter 11 proceedings might arise after the insurance settlements were approved and Manville's reorganization was confirmed.[7]  In the order appointing the FCR (the "FCR Order"), the bankruptcy court defined the class of future claimants represented by the FCR as "those persons who have been exposed to asbestos or asbestos products mined, manufactured or supplied by Manville pre-petition and have manifested or will manifest disease post-petition and who are not otherwise represented in these

---

[6]     *See* Appendix to the Brief of Appellant The Bogdan Law Firm, as Counsel for Salvador Parra, Jr. ("App. App'x"), at 246-286..

[7]     *See id.* at 425-427.

4

proceedings."[8]

On December 18, 1986, the bankruptcy court approved various settlement agreements (the "Insurance Settlement Order") among Manville and the members of the Settling Insurer Group, including a settlement agreement between Marsh and Manville dated October 10, 1986.[9]  Four days later, on December 22, 1986, the bankruptcy court confirmed Manville's plan of reorganization (the "Confirmation Order" and together with the Insurance Settlement Order, the "1986 Orders").  The Insurance Settlement Order was incorporated by reference into the Confirmation Order.[10]

The Insurance Settlement Order established a transferred settlement fund (the "Manville Trust"), which was funded with $770 million in settlement payments from the Settling Insurer Group, including a $29.75 million payment by

---

[8]     *Id.* at 425.  *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 644 (2d Cir. 1988) ("The Bankruptcy Court appointed the Legal Representative specifically for the purpose of ensuring that the rights of the future claimants would be asserted where necessary.").

[9]     *See* Brief of Appellee Marsh USA, Inc. ("Marsh Br."), at 6-7 (App. App'x at 96-104).

[10]     *See* Appendix to the Brief of Appellee Marsh USA, Inc. ("Marsh App'x"), at 3, 352-353.

Marsh.[11]  Marsh received a release of, and injunction against, the "Marsh Claims."

The "Marsh Claims" are defined in the Insurance Settlement Order as:

> any and all claims, demands, allegations, duties, liabilities and obligations (whether or not presently known) which have been, or could have been, or might be, asserted by any Person against [Marsh] based upon, arising out of or relating to services (whether acts or omissions) performed by [Marsh] for [Manville], at any time, in connection with insurance policies issued to or for the benefit of [Manville] . . . including, without limitation, the negotiation, placement and securing of such policies, and attempts to receive the proceeds of, as well as the application for, advice concerning and any claims asserted under, such policies.[12]

The Insurance Settlement Order further provides for a "channeling injunction,"

which directs into the Manville Trust:

> any and all claims, charges, or encumbrances which might otherwise have been assessable or assertable by any person against or with respect to [Manville's] rights and interests based upon, arising out of or related to Marsh Claims, and any and all claims or causes of action in law, equity, admiralty or otherwise based upon, arising out of, or related to Marsh Claims which were or are assessable or assertable by any Person against any or all members of the Marsh Group are transferred, and shall attach, solely to the Transferred Settlement Fund.[13]

> The Confirmation Order combines the injunctive provisions of the

---

[11]     *See* App. App'x at 101.

[12]     *Id.* at 100.

[13]     *Id.* at 103.

settlements into a comprehensive injunction.  The Confirmation Order states that "[a]ll Persons and Governmental Units are hereby stayed, restrained and enjoined from . . . [c]ommencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding" against the parties to the Insurance Settlement Order.[14]  "The Trust has since paid out more than $3.2 billion to over 600,000 claimants."[15]

### B.    The Travelers Litigation

The 1986 Orders were affirmed by the District Court and the Second Circuit and became final on October 28, 1988.[16]  In the early 2000s, Travelers faced a series of state-law actions in which plaintiffs alleged that Travelers was liable for its own "wrongdoing while acting as Manville's insurer or of its misuse of information obtained from Manville as its insurer."[17]  The state-law actions "came in two flavors: (1) 'Statutory Direct Actions' based on states' statutory regulation of insurance practices; and (2) 'Common Law Direct Actions,' in which

---

[14]     Marsh App'x at 3, 367-368.

[15]     *Bailey*, 557 U.S. at 141.

[16]     *See In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1987); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89 (2d Cir. 1988).

[17]     *Bailey*, 557 U.S. at 140.

it was alleged that Travelers and others violated 'duties to disclose certain asbestos-related information [that they] learned' as asbestos-industry insurers."[18]

Travelers sought an order from the bankruptcy court enforcing the injunction against the state-law plaintiffs.  In November 2003, Travelers reached a settlement of the claims, agreeing to pay up to $445 million into a fund.  However, Travelers' agreement to pay $445 million into the fund was contingent upon the bankruptcy court's entry of an order clarifying that the claims against Travelers in the state-law actions were — and had always been — barred by the 1986 Orders. The bankruptcy court later entered the "Clarifying Order" which stated that the injunction barred, among other things, "the bringing of claims against insurers that arise out of, are based upon[,] or related to settled policies."[19]

In issuing the Clarifying Order, the bankruptcy court made several findings of fact.  *First*, the bankruptcy court found that because "the range of products containing Manville asbestos is extremely broad and practically immeasurable . . . there are no industries from which claimants originate where Manville did not provide asbestos products — either manufactured or raw

---

[18]     *Chubb*, 600 F.3d at 142 (quoting *Manville III*, 517 F.3d at 58).

[19]     App. App'x at 178.

8

materials."[20]  Based on this, the bankruptcy court held that "the breadth and length of Manville's asbestos involvement compels the conclusion, as a factual matter, that essentially all potential asbestos claimants . . . have been exposed to Manville asbestos through Manville's pervasive asbestos mining, processing and manufacturing activities."[21]  *Second*, the bankruptcy court found that, as Manville's primary insurer, "Travelers learned virtually everything it knew about asbestos from its relationship with Manville."[22]  The bankruptcy court found that the only claims that were not enjoined as to Travelers were claims as to which "Travelers['] alleged liability or the proof required to establish Travelers['] alleged liability is unrelated to any knowledge Travelers gained from its insurance relationship with Manville or acts, errors, omissions, or evidence related to Travelers['] insurance relationship with Manville . . . ."[23]

The Clarifying Order was affirmed in *Manville II*.  In *Manville III*, the Second Circuit reversed, concluding that "a bankruptcy court only has

---

[20]     *Manville I*, 2004 WL 1876046, at *3.

[21]     *Id.* at *5.

[22]     *Id.* at *13.

[23]     8/17/04 Order Approving Settlement of the Statutory, Hawaii and Common Law Direct Actions and Clarifying Confirmation Order, Including Insurance Settlement Order and Channeling Injunction at 6, App. App'x at 182.

jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate."[24]  The Second Circuit held that the bankruptcy court lacked subject matter jurisdiction to enjoin claims that "aim to pursue the assets of Travelers[,] . . . make no claim against an asset of the bankruptcy estate, [and] do [not] . . . affect the estate."[25]

The Supreme Court reversed *Manville III* in *Travelers Indemnity Co. v. Bailey*.  The Court held that because the 1986 Orders were final and no longer subject to appeal, res judicata prevented collateral attack of the bankruptcy court's subject matter jurisdiction.[26]  However, the Supreme Court emphasized that its holding was narrow.  *First*, it did "not resolve whether a bankruptcy court, in 1986 or today, could properly enjoin claims against nondebtor insurers that are not derivative of the debtor's wrongdoing."[27]  *Second*, it did not "decide whether any particular [party] is bound by the 1986 Orders . . . ."[28]  With regard to the second point, the Supreme Court remanded to the Second Circuit, explaining that:

> We have assumed that respondents are bound, but the Court of

---

24    *Manville III*, 517 F.3d at 66.

25    *Id.* at 65.

26    *See* 557 U.S. at 152-54.

27    *Id.* at 154.

28    *Id.*

10

Appeals did not consider this question. [Chubb Indemnity Insurance Company ("Chubb")], in fact, relying on *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), has maintained that it was not given constitutionally sufficient notice of the 1986 Orders, so that due process absolves it from following them, whatever their scope. The District Court rejected this argument, but the Court of Appeals did not reach it. On remand, the Court of Appeals can take up this objection and any others that respondents have preserved.[29]

Chubb was an asbestos-industry insurer that was one of Travelers' co-defendants in the common law state-law actions, but it was not a party to the 1984 Insurance Settlement Agreement. Chubb sought to preserve its ability to bring contribution and indemnity claims against Travelers relating to its potential joint liability in the common law actions. On remand, the Second Circuit held that Chubb did not receive sufficient notice of the 1986 Orders to satisfy due process, and, therefore, was not bound by the terms of those Orders.[30] The Circuit Court declined to address whether the state-law plaintiffs appealing from the Clarifying Order had received due process in connection with the 1986 Orders, because those plaintiffs had failed to preserve the issue.[31]

---

[29]    *Id.* at 155.

[30]    *Chubb*, 600 F.3d at 158.

[31]    *See id.* at 147-48.

11

### C.    Parra's Claims Against Marsh and Marsh's Motion

In 2009, Parra filed an action in Mississippi state court asserting state-law claims against a number of defendants, including Marsh.[32]  Parra filed his First Amended Complaint on July 8, 2010.[33]  According to the Complaint, Parra was exposed to asbestos while working as an insulator at various job sites in Louisiana, Mississippi, Oklahoma, and Texas during the late 1960s and early 1970s.  The defendants were producers, distributors, or insurers of asbestos products which, according to Parra, "knew or should have known through industry and medical studies . . . of the health hazards . . . inherent in the asbestos-containing products."[34]  According to Parra, the "Complaint is premised on claims of direct, independent, and nonderivative misconduct on the part of Marsh, including claims of negligent undertaking and claims based on Marsh's breach of various common law duties to Parra independent of any relationship with Manville."[35]  The Complaint alleges, "that Marsh USA, Inc. aided and abetted and conspired with Defendants including, but not limited to, Foster Wheeler, Riley Stoker, General

---

[32]    *See* Marsh Br. at 15.

[33]    *See* App. App'x 487-539 ("Complaint").

[34]    Complaint ¶ 12.

[35]    Brief of Appellant The Bogdan Law Firm, as Counsel for Salvador Parra, Jr. ("Parra Br."), at 13.

Electric, Bechtel Corporation, and other entities such as Johns Manville, Fibreboard and The Lummus Company."[36]  Furthermore, "Marsh willfully suppressed the truth as to the risks and dangers associated with the use of and exposure to Defendants' (such as Foster Wheeler, Riley Stoker, General Electric and Bechtel Corporation) and other entities (such as Johns Manville and The Lummus Company) asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products."[37]

Parra's primary claim against Marsh is set forth in Count Four of the Complaint, which seeks to hold Marsh liable for its "negligent undertakings, conspiracy, aiding, and abetting courses of conduct."[38]  Count Four contains a detailed recitation of facts outlining the nature and extent of Marsh's insurance relationship with Manville.[39] Among other things, Parra alleges that "Marsh had a relationship with . . . Johns-Manville for over forty years,"[40] that Marsh "functioned not only as a broker but as Johns-Manville's insurance department,"[41]

---

[36]     Complaint ¶ 8(l).

[37]     *Id.* ¶ 33.

[38]     *Id.* ¶ 34.

[39]     *See id.* ¶¶ 55-86.

[40]     *Id.* ¶ 53.

[41]     *Id.* ¶ 62.

and that Marsh's relationship with Manville was "unique."[42]

On August 6, 2010, Marsh filed a motion in the bankruptcy court to enforce the 1986 Orders.  Marsh argued that the claims asserted in the Complaint fall "squarely within" the injunction contained in the 1986 Orders.[43]  According to Marsh:

> It is apparent from the face of the [Complaint] that whatever theory of liability [Parra] asserts . . . his allegations fall within the scope of the 1986 Orders.  Whether couched in terms of a duty to speak out about the ills associated with asbestos, a duty not to defend Manville to the detriment of [Parra], or a duty to warn [Parra] of the perils associated with Manville's asbestos, these state-law actions assert claims or duties against Marsh that are based upon, arising out of, or relating to the services performed by Marsh for Manville.  Accordingly, they are barred by the 1986 Orders.[44]

Parra filed a response that raised four principal arguments: (1) the Motion is procedurally defective because Marsh failed to file an adversary proceeding; (2) the Motion is premature because Parra should be allowed to conduct discovery in preparation for an evidentiary hearing; (3) on the merits, Parra's claims against Marsh are not subject to the 1986 Orders; and (4) even if his claims are subject to

---

[42]   *Id.* ¶ 65.

[43]   July Order, 534 B.R. at 558 (internal quotation marks omitted).

[44]   *Id.* at 558-59 (internal quotation marks omitted).

the 1986 Orders, Parra did not receive constitutionally sufficient notice of the proceedings because the FCR did not represent him with respect to his claims against Marsh for Marsh's independent misconduct.[45] Marsh filed a reply. In November 2010, Travelers filed a submission as an interested party. Travelers took no position on whether Parra's claims were barred by the 1986 Orders. Instead, Travelers asked to be heard solely to oppose Parra's "remarkable suggestion" that he is not bound by the 1986 Orders on due process grounds.[46]

The matter was held in abeyance for several years pending the conclusion of the litigation involving Travelers. Ultimately, Judge Morris held that (1) Marsh could proceed by motion rather than adversary proceeding; (2) Parra was not entitled to discovery; (3) Parra's claims are barred by the plain language of the 1986 Orders; (4) Parra's due process rights were not violated; and (5) Parra was not barred from amending his Complaint to assert claims not barred by the 1986 Orders. On appeal, Parra argues that the bankruptcy court erred with respect to items (1) through (4).

## II.    LEGAL STANDARD

A district court functions as an appellate court in reviewing orders

---

[45]    *See id.* at 559.

[46]    App. App'x at 448.

entered by bankruptcy courts.[47]  Findings of fact are reviewed for clear error,

whereas findings that involve questions of law, or mixed questions of fact and law,

are reviewed de novo.[48]  A bankruptcy court's interpretation of its own order

"warrants customary appellate deference [because t]he bankruptcy court [is] in the

best position to interpret its own orders."[49]

## III.   APPLICABLE LAW

Due process requirements apply in bankruptcy cases.[50]  Thus, a party

that does not receive adequate notice of a bankruptcy case cannot be bound by

---

[47]     *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir. 1993).

[48]     *See In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 52 (S.D.N.Y. 2003) (citing *In re United States Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999)).

[49]     *In re Casse*, 198 F.3d 327, 333 (2d Cir. 1999) (internal quotation marks omitted).

[50]     *See Chubb*, 600 F.3d at 154 ("'[W]here a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate preexisting rights *if the scheme is otherwise consistent with due process.*'") (emphasis in the original) (quoting *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989)); *United States v. Security Indus. Bank*, 459 U.S. 70, 75 (1982) (holding that however "rational the exercise of the bankruptcy power may be, that inquiry is quite separate from the question whether the enactment takes property within the prohibition of the Fifth Amendment") (citing *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment.")).

orders issued during that case.[51]  Notice must be "reasonably calculated, under all

the circumstances, to apprise interested parties of the pendency of the action and

afford them an opportunity to present their objections."[52]  "Where notice cannot be

given because the party sought to be affected is not yet known, such as a person

who will later suffer injury from a product previously manufactured by the debtor,

due process generally prevents the party from being adversely affected by the

order."[53]

          A special notice problem arises in asbestos cases, where the unknown

---

[51]     *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d
145, 150 (2d Cir. 2014) ("[A] claim cannot be discharged if the claimant is denied
due process because of lack of adequate notice."); *Chubb*, 600 F.3d at 153-54
(same); *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*,
467 B.R. 694, 706 (S.D.N.Y. 2012) ("[F]or due process reasons, a party that did
not receive adequate notice of bankruptcy proceedings [can] not be bound by
orders issued during those proceedings.").

[52]     *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314
(1950).  "[W]hether notice comports with due process requirements turns on the
reasonableness of the notice, a flexible standard that often turns on what the debtor
or the claimant knew about the claim or, with reasonable diligence, should have
known."  *DPWN Holdings (USA), Inc.*, 747 F.3d at 150 (internal citations omitted)
(citing *Mullane*, 339 U.S. at 314 and *Chemetron Corp. v. Jones*, 72 F.3d 341, 345-
46 (3d Cir. 1995)).  "Generally, if the name and address of the adversely affected
party are readily ascertainable, then that party is entitled to receive actual notice by
a reasonable method of delivery; if not readily ascertainable, then notice by
publication is permitted."  2-102 Collier on Bankruptcy P 102.02 (16th Ed.).

[53]     2-102 Collier on Bankruptcy P 102.02.

individuals may not manifest injuries — and therefore may not themselves know they have a right to recovery — until years after plan confirmation.[54]  Judge Lifland famously sought to address this problem by creating the Manville Trust, appointing an FCR, and issuing the 1986 channeling injunction.  Later, a version of the bankruptcy court's 1986 channeling injunction was codified at 11 U.S.C. § 524(g).[55]  "Section 524(g) mandates the channeling of related claims to a personal injury trust, thereby relieving the debtor of the uncertainty of future asbestos liabilities and helping to achieve the purpose of Chapter 11 by facilitating the

---

[54]     *See, e.g.*, Frederick Tung, *The Future Claims Representative in Mass Tort Bankruptcy: A Preliminary Inquiry*, 3 Chap. L. Rev. 43, 53-54 (2000) ("The first and most critical problem is the inability of future claimants to participate and protect their interests in the bankruptcy proceeding.  Because their injuries have not manifested by the time of bankruptcy, future claimants may be impossible to identify or even describe except in general terms. Some may not even have been born at the time of the bankruptcy filing. Even identified, many may not come forward to participate in a proceeding whose potential effect on them is remote. It may be difficult to convince a potential future tort victim to invest resources today in a proceeding that will affect her, if ever, only years into the future. Whether any type of notice would be meaningful in this situation is questionable.").

[55]     It should be noted that section 524 is the only provision of the Bankruptcy Court that explicitly authorizes a bankruptcy court to enter an order releasing a nondebtor from liability.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005).

18

reorganization and rehabilitation of the debtor as an economically viable entity."[56]

As explained by one court,

> Many of the[] requirements [of section 524] are specifically tailored to protect the due process rights of future claimants. For example, a court employing a § 524(g) channeling injunction must determine that the injunction is "fair and equitable" to future claimants, 11 U.S.C. § 524(g)(4)(B)(ii), and must appoint a futures representative to represent their interests. 11 U.S.C. § 524(g)(4)(B)(i). The court must also determine that the plan treats "present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). Finally, the statute requires that a 75% super-majority of claimants whose claims are to be addressed by the trust vote in favor of the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).[57]

"Without the appointment of . . . [an FCR] to provide adequate representation to

the absent future claim holders, it is doubtful that the injunction provisions binding

---

[56]  *Manville III*, 517 F.3d at 67. *See* Tung, *The Future Claims Representative* at 54 ("A failure of due process would preclude the bankruptcy from affecting future claimants' legal rights. That of course would frustrate the primary purpose of the bankruptcy filing — to achieve a comprehensive and final settlement of all future claims liability.").

[57]  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004), as amended (Feb. 23, 2005). In addition, an injunction can be entered only after "notice and a hearing." 11 U.S.C. § 524(g)(1)(A) ("After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.").

them would be found to comply with the due process clause."[58]  Notably, section

524(g) "'limits the situations where a channeling injunction may enjoin actions

against third parties to those where a third party has derivative liability for the

claims against the debtor.'"[59]

## IV.   DISCUSSION

### A.   Marsh Was Entitled to Proceed by Motion

Parra argues that the bankruptcy court erred when it permitted Marsh

to obtain injunctive relief without filing an adversary proceeding under Federal

Rule of Bankruptcy Procedure 7007(7).[60]  While a proceeding to obtain an

---

[58]      4-524 Collier on Bankruptcy P 524.07.  *See* Ann. Manual Complex
Lit. § 22.58 (4th ed.) ("Most authorities that have supported the treatment of future
claims in mass tort bankruptcies have relied on the appointment of a future claims
representative, not merely notice, as the key to satisfying due process.").

[59]      *Chubb*, 600 F.3d at 153 (quoting *Combustion Eng'g, Inc.*, 391 F.3d at
234).  "'A bankruptcy court only has jurisdiction to enjoin third party non-debtor
claims that directly affect the *res* of the bankruptcy estate.'"  *In re Residential
Capital, LLC*, 508 B.R. 838, 848 (Bankr. S.D.N.Y. 2014) (quoting *Chubb*, 600
F.3d at 152).  *See also In re Quigley Co.*, 676 F.3d 45, 53 (2d Cir. 2012)
("Bankruptcy jurisdiction is appropriate over third-party non-debtor claims that
directly affect the *res* of the bankruptcy estate.") (internal quotation marks
omitted).

[60]      *See* Fed. R. Bankr. P. 7007(7) (stating that "[t]he following are
adversary proceedings: . . . a proceeding to obtain injunction or other equitable
relief").

injunction must be brought as an adversary proceeding,[61] "the enforcement of a preexisting injunction" may be accomplished as a contested matter rather than through an adversary proceeding.[62]  Marsh's motion seeks to enforce the release and injunction provisions of the 1986 Orders and not to obtain a new injunction. Thus, the bankruptcy court did not err in considering Marsh's request as a contested matter rather than requiring an adversary proceeding.

### B.    Parra's Claims Fall Within the Scope of the 1986 Orders

The bankruptcy court compared the plain language of the Insurance Settlement Order to the allegations set forth in Parra's Complaint and determined that the claims were "related to" Marsh's insurance relationship with Manville and therefore enjoined by the 1986 Orders.[63]  According to the bankruptcy court, "this [was] established by, among other things, Parra's specific and extensive allegations regarding the ways in which Marsh learned information about the health hazards of asbestos exposure from its relationship with Manville."[64]

---

[61]    *See In re St. Vincents Catholic Med. Ctrs. of N.Y.*, 445 B.R. 264, 270 (Bankr. S.D.N.Y. 2011).

[62]    *Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 93 (2d Cir. 2010).

[63]    July Order, 534 B.R. at 564.

[64]    *Id.* (citing Complaint ¶¶ 55-86).

21

Parra argues that the bankruptcy court erred by holding that his claims were barred by the 1986 Orders without first holding an evidentiary hearing to determine, among other things, "that there [was] a sufficient nexus between the conduct complained of [in the Parra Complaint] and the services [Marsh] provided to Manville."[65]  He contends that "Marsh [was required to] show that its malfeasance . . . would have necessarily been performed for Manville exclusively and not related services performed for another client" and that the "only way Marsh could show this was by proving that its relationship with Manville was so intertwined that it learned everything about asbestos from Manville . . . ."[66]  Parra concludes that because Marsh did not even attempt to make this showing, "the record below was insufficient to establish the actions complained of in the Parra Complaint were sufficiently 'related to' services Marsh performed on behalf of Manville to be barred by the 1986 Orders."[67]

Parra's argument is inconsistent with how the language of the 1986 Orders have been interpreted in these proceedings and misstates the applicable law.

---

[65]     Parra Br. at 24.

[66]     *Id.* at 30.

[67]     *Id.*

22

"Court orders are construed like other written instruments, except that the determining factor is not the intent of the parties, but that of the issuing court."[68] With respect to Marsh, the Insurance Settlement Order provides that "all Persons, except Marsh, are restrained and enjoined from commencing and/or continuing any action, suit, arbitration or other proceeding of any type or nature against [Marsh] based upon, arising out of or related to Marsh Claims."  "Marsh Claims" are defined to include:

> [A]ny and all claims, demands, allegations, duties, liabilities and obligations (whether or not presently known) which have been, or could have been, or might be, asserted by any Person against [Marsh] based upon, arising out of or relating to services (whether acts or omissions) performed by [Marsh] for [Manville], at any time, in connection with insurance policies issued to or for the benefit of [Manville] . . . .

In *Travelers Indemnity Company v. Bailey*, the Supreme Court interpreted substantially similar language with respect to the state-law claims brought against Travelers.  Specifically, the Court held that the claims were Policy Claims enjoined "by the language of the 1986 Orders, which covered 'claims, demands, allegations, duties, liabilities and obligations' against Travelers, known or unknown at the time, 'based upon, arising out of or relating to' Travelers'

---

[68]     *United States v. Spallone*, 399 F.3d 415, 424 (2d Cir. 2005).

insurance coverage of Manville."[69]  The Court determined that the language was

unambiguous and noted that the phrase "in relation to" is "expansive":

> Although it would be possible (albeit quite a stretch) to suggest that a "claim" only relates to Travelers' insurance coverage if it seeks recovery based upon Travelers' specific contractual obligation to Manville, "allegations" is not even remotely amenable to such a narrow construction and clearly reaches factual assertions that relate in a more comprehensive way to Travelers' dealings with Manville.[70]

The *Bailey* court *then* explained that:

> The Bankruptcy Court's uncontested factual findings drive the point home.  In substance, the Bankruptcy Court found that the Direct Actions seek to recover against Travelers either for supposed wrongdoing in its capacity as Manville's insurer or for improper use of information that Travelers obtained from Manville as its insurer.  These actions so clearly involve "claims" (and, all the more so, "allegations") "based upon, arising out of or relating to" Travelers' insurance coverage of Manville, that we have no need here to stake out the ultimate bounds of the injunction. There is, of course, a cutoff at some point, where the connection between the insurer's action complained of and the insurance coverage would be thin to the point of absurd.  But the detailed findings of the Bankruptcy Court place the Direct Actions within the terms of the 1986 Orders without pushing the limits.[71]

Thus, while the Supreme Court used *Manville I*'s factual findings to

---

[69]     *Bailey*, 557 U.S. at 148.

[70]     *Id.* at 148-49.

[71]     *Id.* at 149 (internal citations omitted).

"drive the point home," it did not rely on the fact that state-law claims were "inextricably intertwined" with Travelers' relationship with Manville. Instead, *Bailey* suggests that "related to" claims fall within a spectrum between claims that are "inextricably intertwined" and those that stretch the relationship so thin as to be absurd. Accordingly, there is no merit to Parra's argument that Marsh was required to prove that Parra's claims were "inextricably intertwined" with Marsh's insurance relationship with Manville in order to establish that Parra's claims fall within the scope of the 1986 Orders.

Further, the bankruptcy court did not abuse its discretion by determining that Parra's claims "related to" Marsh's services to Manville without allowing discovery. The allegations in Parra's Complaint are sufficient to establish the required nexus under *Bailey*.[72] Accordingly, the bankruptcy court did not err in

---

[72] The bankruptcy court found that the Complaint's allegations were binding judicial admissions. *See* July Order, 534 B.R. at 563. It is debatable whether the doctrine applies. *See Hausler v. JP Morgan Chase Bank, N.A.*, No. 09 Civ. 10289, 2015 WL 5236481, at *16 (S.D.N.Y. Aug. 4, 2015) ("[A] judicial admission only binds the party that makes it in the action in which it is made. Unless the elements of estoppel are present, in the later action the judicial admission in the earlier action is treated as an evidentiary admission.") (internal quotation marks and citations omitted)). However, whether the allegations are judicial admissions or not is beside the point. Parra has asserted claim that by their terms falls within the scope of the 1986 Orders as interpreted by the Supreme Court in *Bailey*. He has not made a showing that discovery is warranted — *i.e.*, it does not appear, and Parra has not provided a reason to believe, that he could assert

holding that Parra's claims fell within the scope of the 1986 Orders.

### C.     The Case Must be Remanded to Address Whether Parra Received Sufficient Due Process in Connection with the Entry of the 1986 Orders

In *Bailey*, the Supreme Court held that the bankruptcy court's subject matter jurisdiction to enter the 1986 Orders could not be challenged collaterally because the 1986 Orders were final and no longer subject to appeal.[73]  While Parra cannot challenge the 1986 Orders on the basis of subject matter jurisdiction, there is no question that the bankruptcy court exceeded its subject matter jurisdiction in barring Parra's claims against Marsh.  According to the Second Circuit opinion in *Manville III*, "a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate."[74]  However, Parra's claims do not seek to collect from the assets of the estate — *i.e.*, the insurance policy proceeds — but seek to hold Marsh liable for its independent wrongdoing, not Manville's.  As such, Parra's claims do not seek to collect from the *res* of the Manville chapter 11 estate, but are *in personam* claims for liability

---

a claim not covered by the 1986 Orders.

[73]     557 U.S. at 152-55.

[74]     517 F.3d at 66.

against Marsh.

Thus, under a broad reading of the terms "related to" in the Insurance

Settlement Order, Parra's claims are "related to" Marsh's insurance relationship

with Manville and are therefore subject to the injunctions in the 1986 Orders.

Furthermore, under *Bailey* Parra cannot challenge whether the bankruptcy court

had the subject matter jurisdiction to enter the 1986 Orders, because those Orders

are final and no longer appealable.  However, as a matter of due process, the 1986

Orders are not "[]enforceable against" Parra unless he received sufficient notice

and representation in the proceedings that led to the entry of those Orders.[75]  The

bankruptcy court held that Parra received constitutionally appropriate

representation by virtue of the appointment of the FCR, who — from the time of

his appointment in August 1984 to the entry of the 1986 Orders — worked

vigorously on behalf of future asbestos claimants to ensure that the 1986 Orders

protected their rights.  To place that holding in its proper context, it is necessary to

review the prior due process rulings in these proceedings and consider those

---

[75]     *In re Motors Liquidation Co.*, 529 B.R. 510, 581-82 (Bankr. S.D.N.Y. 2015) ("[*Chubb*] must be read as having concluded that after a denial of due process prejudicing only a single party (even if the order affects other parties, and affecting those other parties is unthinkable), the partial denial of enforcement of that order, insofar as it binds that party alone, is permissible.").

rulings in the context of Parra's *in personam* claims against Marsh.

### 1.     The Second Circuit's Due Process Analysis in *Chubb*

The courts in *Manville I* and *Manville II* rejected the argument that Chubb — which sought to bring contribution and indemnity claims against Travelers — had not received sufficient notice or representation in connection with the entry of the 1986 Orders.  In *Manville I*, the bankruptcy court held that Chubb was bound by the 1986 Orders after finding that Chubb's claims fell within the scope of both the Confirmation Order and the Insurance Settlement Order. Specifically, the Confirmation Order barred "any suit, action or other proceeding . . . against or affecting . . . any of the Settling Insurance Companies," and the Insurance Settlement Order prohibited "any suit, arbitration or other proceeding of any type or nature for Policy Claims against any or all members of the Settling Insurer Group."[76]

---

[76]     *Manville I*, 2004 WL 1876046, at *33 (internal quotation marks omitted).  The state-law plaintiffs argued that their claims did not fall within the scope of the 1986 Orders. The bankruptcy court held that "[t]he evidence in this proceeding establishes that the gravamen of [the state-law claims] were acts or omissions by Travelers arising from or relating to Travelers insurance relationship with Manville.  Thus, claims against Travelers based on such actions or omissions necessarily 'arise out of' and [are] 'related to' the [Insurance] Policies."  *Id.* at *32. The Supreme Court adopted these holdings in *Bailey*.  *See Chubb*, 600 F.3d at 146 (explaining that the Supreme Court had "reasoned that the [state-law] [a]ctions — and, presumably, claims by Chubb against Travelers for contribution and

In *Manville II*, the district court relied on different grounds to reject Chubb's due process argument.  Two of them are relevant here.  *First*, the court cited *Ortiz v. Fibreboard Corporation* for the proposition that there is "an exception to the due process concerns raised by Chubb 'where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate.'"[77]  *Second*, the court held that the publication notice provided in 1984 had put Chubb "on notice with regard to whatever asbestos related claims it may have against Travelers and the other settling insurers."[78]

In *Chubb*, after remand from the Supreme Court, the Second Circuit considered and rejected the due process rulings in *Manville I* and *Manville II*.  With respect to the bankruptcy court's position, *Chubb* explained that "the text of the orders that were ultimately entered in 1986 does not speak to whether Chubb was afforded due process during the proceedings that led to the entry of those orders in the first place."[79]  The Second Circuit began its discussion of *Manville II*

---

indemnity — are 'Policy Claims' under the 1986 Orders").

[77]     *Manville II*, 340 B.R. at 68 (quoting *Ortiz*, 527 U.S. at 846).

[78]     *Id.*

[79]     *Chubb*, 600 F.3d at 149 ("In reasoning otherwise, and by grouping together what should have been distinct inquiries regarding subject matter

29

by looking at the nature of the Common Law Direct Actions, the gravamen of which was that "the insurance industry as a whole had a duty to warn the general public about the dangers of asbestos."[80]  As with Chubb's contribution and indemnity claims, such claims did not seek to collect from assets of the estate — *i.e.*, the insurance policy proceeds — and sought to hold Travelers liable for its independent wrongdoing, not Manville's.[81]  As such, the claims did not seek to collect from the *res* of the Manville chapter 11 estate, but were *in personam* claims for liability against Travelers.[82]

        "When a court exercises *in personam* authority, it addresses a claim for liability, such as one involving a claim for money damages, against a particular party."[83]  "In contrast, the bankruptcy court's *in rem* authority is, for the most part,

---

jurisdiction and Chubb's due process rights, the bankruptcy court put the proverbial cart before the horse by assuming that Chubb was bound by the 1986 Orders.").

[80]    *Id.* at 151 (internal quotation marks omitted).

[81]    *See id.*  The fact that the claims were independent or non-derivative is relevant "not as an independent jurisdictional requirement but as a factor demonstrating . . . that [such claims] would not effect [the *res* of] the bankruptcy estate."  *Quigley Co., Inc.*, 676 F.3d at 57.

[82]    *See Chubb*, 600 F.3d at 151-53.

[83]    *Id.* at 153 n.13 (citing  Restatement (Second) of Judgments § 2 cmt. b, at 36-37; Black's Law Dictionary 930 (9th ed. 2009) (defining "personal

limited to the resolution of claims against the property in the bankruptcy estate."[84] While the Second Circuit continued to believe, as it held in *Manville III*, that the 1986 Orders, as interpreted in 2004, exceeded the scope of the bankruptcy court's *in rem* jurisdiction, it recognized that "under *Bailey*, the parties who were present or represented in the proceedings that led to the entry of the 1986 Orders are barred from collaterally attacking" subject matter jurisdiction.[85]

However, *Chubb* found that the bankruptcy court's interpretation of the 1986 Orders to include *in personam* claims altered the due process analysis. *First*, the due process "exception" discussed by the Supreme Court in *Ortiz* did not apply.  "[T]he *Ortiz* Court was discussing an *in rem* 'exception' to the due process principles associated with *in personam* jurisdictional acts . . . . [but] the bankruptcy court was not exercising its *in rem* power when it concluded that Chubb's claims were enjoined."[86]  *Second*, because the 1986 Orders precluded Chubb's *in*

---

jurisdiction"); *Retirement Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 426 (2d Cir. 2004) ("[A]n *in personam* action involves a controversy over liability rather than over possession of a thing.")).

[84]     *Id.*

[85]     *Id.* at 153.

[86]     *Id.* at 153-54.

*personam* claims, the Second Circuit believed that it should look to class action settlements in toxic tort cases rather than to *in rem* bankruptcy proceedings when considering notice and representation issues.[87]  In the class context, "[d]ue process requires adequate representation 'at all times' throughout the litigation, [and] notice 'reasonably calculated . . . to apprise interested parties of the pendency of the action . . . .'"[88]  With respect to *representation*, the Second Circuit explained that:

> there is no indication in the record that the sort of claims Chubb seeks to bring against Travelers were contemplated, much less accounted for, during the proceedings that led to the 1986 Orders. Neither Travelers nor the district court have suggested otherwise, and the terms of the bankruptcy court's August 14, 1984 Order appointing the FCR make this point plain. The bankruptcy court ordered the FCR to concern himself with "persons who have been exposed to" Manville's asbestos products and who may

---

[87]    *See id.* at 154-56 (discussing *Amchem Prods., Inc.*, 521 U.S. 591 and *Stephenson v. Dow Chem. Co.*, 273 F.3d 249 (2d Cir. 2001)).  In *Amchem*, which is also an asbestos case, the Supreme Court affirmed denial of class certification because of a failure to satisfy the predominance and representation requirements of Federal Rule of Civil Procedure 23.  The *Chubb* court noted that while the Supreme Court "declined to resolve [ ] due process issue[s] in light of its holding that the proposed class could not satisfy Rule 23, [ ] it recognized 'the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous.'" *Id.* at 155 (quoting *Amchem*, 521 U.S. at 628).

[88]    *Stephenson*, 273 F.3d at 260 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985)).

> subsequently "manifest disease post-petition." Chubb does not
> fall within that category, and its interests relating to inchoate,
> non-derivative, post-petition claims against Travelers were not
> spoken for in those proceedings.[89]

The Second Circuit also reasoned that the publication notice was constitutionally

insufficient:

> In order to comprehend that the contemplated channeling
> injunction would bar Chubb's *in personam* non-derivative claims
> against Travelers, the recipient of the Notice would have to
> predict that the bankruptcy court would exceed its *in rem*
> jurisdiction in entering the 1986 Orders. Such recipient would
> also have to be presumed to know — or to be able to discern from
> the 1984 Notice document — the factual extent of Travelers'
> relationship with Manville, which ultimately served as the
> lynchpin of the bankruptcy court's 2004 interpretation of the 1986
> Orders.[90]

### 2.     Application of *Chubb* to Parra's Claims Against Marsh

Parra's claims do not seek to collect from the *res* of the Manville

chapter 11 estate. They are not claims against the insurance policies. Rather, they

are *in personam* claims against Marsh for Marsh's independent misconduct.

Although *Chubb* concerned claims for indemnity and contribution, and not claims

against an insurer or an insurance broker, the due process principles articulated in

---

[89]     *Chubb*, 600 F.3d at 156.

[90]     *Id.* at 157.

33

*Chubb* are no less relevant to Parra's claims against Marsh.

The first principle is that the text of the 1986 Orders "does not speak to whether [Parra] was afforded due process in the proceedings that led to the entry of those orders in the first place."[91]  The second is that "the 'special remedial scheme' due process 'exception' relating to *in rem* bankruptcy proceedings" does not apply to the extent the 1986 Orders purported to bar a future claimant from proceeding against a non-debtor on an *in personam* basis.[92]  The third is that with respect to *in personam* claims, "the better due process analogy in terms of notice and representation principles is to class action settlements, not *in rem* bankruptcy proceedings."[93]

Parra's argument both before the bankruptcy court and this Court is that while he was a "future asbestos claimant" with respect to his claims against Manville, the FCR was not "authorized to represent him . . . with respect to [his] independent non-derivative claims against non-Manville third parties."[94]  Viewed

---

[91]     *Id.* at 149.

[92]     *See id.* at 153-54.

[93]     *Id.* at 154.

[94]     Reply Brief of Appellant the Bogdan Law Firm, as Counsel for Salvador Parra, Jr. at 15 (internal quotation marks omitted).

another way, Parra concedes that he received due process with respect to *in rem* claims against Manville, but not with respect to his *in personam* claims against Marsh.

The bankruptcy court thus misstated the issue when it determined that the "sole question [was] . . . whether the [FCR] in this case was appointed to represent the interests of future asbestos claimants as against both Manville and the settling insurers."[95]  The problem is that the bankruptcy court does not distinguish between *in rem* and *in personam* claims.  While the FCR was no doubt appointed to represent future claimants with respect to *in rem* claims against settling insurers, that does not mean that the FCR was appointed to represent future claimants with respect to their *in personam* claims.

According to the bankruptcy court, "[n]othing in the Bankruptcy court's order appointing the future claimants' representative limited the scope of

---

[95]     July Order, 534 B.R. at 567.  In framing the issue this way, the bankruptcy court might be viewing Parra's claims through the lens of Judge Lifland's 2004 interpretation of the 1986 Orders, which did not distinguish between *in rem* and *in personam* claims.  To the extent that is the case, the bankruptcy court is violating the first principle of *Chubb* — that the text of the 1986 Orders "does not speak to whether [Parra] was afforded due process in the proceedings that led to the entry of those orders in the first place."  *Chubb*, 600 F.3d at 149.

his representation solely to claims against Manville."[96]  To the extent that the

bankruptcy court is interpreting the FCR Order to be unambiguous and that its

unambiguous meaning is that the FCR was authorized to represent Parra with

respect to *in personam* claims against Marsh, this interpretation is rejected.  While

a bankruptcy court's interpretation of its own orders is entitled to customary

appellate deference, "such deference is only appropriate where the court drafts the

order," as the rule of deference is "premised on the truism that the draftsman of a

document is uniquely situated to understand the intended meaning of that

document."[97]  Thus, Judge Morris' interpretation of Judge Lifland's order is not

entitled to customary appellate deference.

The absence of language limiting the FCR's duties does not render the

---

[96]     July Order, 534 B.R. at 567.  The July Order states "[i]ndeed, courts
have held that limiting the role of a future claimants' representative would be
'inappropriate.'"  *Id.* (quoting *In re G-I Holdings, Inc.*, 292 B.R. 804, 809 (Bankr.
D.N.J. 2003)).  In *G-I Holdings, Inc.*, the debtor argued that under section 524, an
FCR could only intervene on plan-related issues.  The bankruptcy court reviewed
the plain language of section 524 and the legislative history and concluded that it
would "not interpret the House Committee's comments as limiting the legal
representative's role to plan formation issues only" and that "limiting the role of a
legal representative is inappropriate because the facts of different cases may
require that a legal representative have a different one."  *G-I Holdings, Inc.*, 292
B.R. at 809.  *G-I Holdings, Inc.* is not relevant.

[97]     *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 251-52 (2d Cir. 2010)
(internal quotation marks and emphasis omitted).

FCR Order unambiguous as to the scope of the FCR's representation.  That ambiguity is not resolved by the fact that the FCR had the "'full panoply of rights and duties of representation available to an official committee[,]'"[98] or that the FCR "used that authority and actually represented the interests of future asbestos claimants in connection with the 1986 Orders"[99]  Those facts go to the quality of the FCR's representation of future claimants, not its scope.  The text of the FCR Order does not indicate whether the FCR considered the sorts of claims Parra seeks to bring against Marsh when taking part in the proceedings that led to the 1986 Orders.[100]  Absent specific language directing the FCR to represent future claimants with respect to *in personam* claims against a settling insurer, the FCR would have had to "predict that the bankruptcy court would exceed its *in rem* jurisdiction in entering the 1986 Orders."[101]

At present, there is little support for the contention that limiting the

---

[98]     July Order, 534 B.R. at 567 (quoting *In re Johns-Manville Corp.*, 68 B.R. 618, 626-27 (Bankr. S.D.N.Y. 1986)).

[99]     *Id.* (citing *Johns-Manville*, 68 B.R. at 626 ("[T]he Legal Representative for Future Claimants has been active in the Manville reorganization for over two years.  He has been the catalyst for, if not the architect of, [the] Plan.").

[100]    *See Chubb*, 600 F.3d at 156.

[101]    *Id.* at 157.

FCR's powers to claims affecting Manville's policies "would have been

'nonsensical.'"[102]   Travelers argued that:

> at every step of the process, the FCR was directly involved in the
> negotiation and approval of the settlements and of the provisions
> that were ultimately incorporated into the confirmation order.  The
> Court's order approving the FCR in no way limited the FCR's role
> to preclude the FCR from representing the rights of future
> claimants to assert Manville-related claims against the settling
> insurers.  Indeed, such a limitation would have been completely
> nonsensical, as it would have precluded the ability of the Court to
> confirm the Manville plan at all or to fund the Trust that existed
> for the very *benefit* of future claimants.[103]

Yet, it appears from the record that prior to the entry of the FCR Order in August

1984, Marsh was not a party to a settlement agreement with Manville, thereby

---

[102]     July Order, 534 B.R. at 567 (quoting 11/12/10 Submission of
Travelers Indemnity Company and Travelers Casualty and Surety Company
Concerning Motion for Order Enforcing Confirmation Order and Related Orders,
App. App'x at 455).

[103]     App. App'x at 454-455 (emphasis in original).  In the context of
subject matter jurisdiction, the Second Circuit explained in *Manville III* that "[i]t
was inappropriate for the bankruptcy court to enjoin claims brought against a
third-party non-debtor solely on the basis of that third-party's financial
contribution to a debtor's estate. If that were possible a debtor could create subject
matter jurisdiction over any non-debtor third-party by structuring a plan in such a
way that it depended upon third-party contributions. As we have made clear,
subject matter jurisdiction cannot be conferred by consent of the parties. Where a
court lacks subject matter jurisdiction over a dispute, the parties cannot create it by
agreement even in a plan of reorganization."  517 F.3d at 66 (internal citations
omitted).

undermining the assertion that the FCR represented Parra at every stage of the proceedings.[104]  Furthermore, the *Chubb* decision cites to documents that call into question whether the settling insurers expected to be protected from *in personam* claims:

> The bankruptcy court's August 2, 1984 Notice of Hearing to Consider Approval of Compromise and Settlement of Insurance Litigation indicated that the parties to the Manville Chapter 11 proceedings were seeking an order enjoining all claims, "whether or not presently known," against the Settling Insurers "based upon, arising out of or relating to any or all of the insurance policies" that the Settling Insurers had issued to Manville. . . .
>
> To the extent that the Notice document could be interpreted to suggest that the 1984 Insurance Settlement Agreement would bar non-derivative claims against non-debtors, the parties publicly clarified their intentions by amending the agreement. . . .  Specifically, when certain objectors to the settlement argued that the terms of the proposed channeling injunction exceeded the scope of the bankruptcy court's *in rem* jurisdiction, Travelers signed a letter agreement indicating that the objectors were wrong.  The June 3, 1985 letter agreement stated that it was intended to "clarif[y] the intent of the parties with respect to certain provisions of the [1984 Insurance] Settlement Agreement," and that it was an "amendment" to the Agreement. One portion of the letter stated that "[t]he channeling order is intended *only* to channel claims against the *res* to the Settlement Fund and the injunction is intended *only* to restrain claims against the *res* (*i.e.*, the Policies) which are or may be asserted against the

---

[104]    *See* 8/6/10 Declaration of Brian E. O'Connor, Marsh's counsel, ¶ 5 (stating that Marsh first entered into a settlement agreement with Manville on October 10, 1986).

Settling Insurers."[105]

Far from being nonsensical, these documents suggest that the insurance settlement that funded the Manville Trust may have depended on the clarification that the settlement only concerned claims that affected the *res* of the Manville estate — *i.e.*, the Policies.

Furthermore, under the *Chubb* principles, the relevant inquiry is whether Parra received "adequate representation 'at all times' throughout the litigation, [and] notice 'reasonably calculated . . . to apprise [him] of the pendency of the action . . . .'"  To be sure, the *text* of the FCR Order does not address whether the FCR provided adequate representation with respect to Parra's *in personam* claims against Marsh.  Factual determinations need to be made to assess whether Parra received adequate representation.  That the FCR had certain powers and exercised them with respect to *in rem* claims does not mean that he did so with respect to Parra's claims against Marsh.  Whether *in personam* claims were contemplated and the requisite representation was provided are fact questions.

Accordingly, this matter is remanded to the bankruptcy court for development of the record and application of the due process principles set forth in

---

[105]     *Chubb*, 600 F.3d at 157-58 (emphasis added).

40

*Chubb*.  The bankruptcy court should determine the extent to which the FCR was charged with representing Parra (and other future asbestos claimants) with respect to *in personam* claims against Marsh and, if the FCR was so charged, determine whether the quality of that representation was sufficient to satisfy due process. Finally, as part of its analysis on remand, the bankruptcy court may also consider whether a denial of due process would have resulted in prejudice.  While the Second Circuit has not ruled on the issue, "no less than six [ ] Circuits have . . . identified prejudice as an essential element of a denial of due process claim — saying, in exactly these words or words that are very close, that 'a party who claims to be aggrieved by a violation of procedural due process must show prejudice.'"[106]  It may appear straightforward that Parra is prejudiced if he cannot

---

[106]    *Motors Liquidation Co.*, 529 B.R. at 561 (quoting *Perry v. Blum*, 629 F.3d 1, 17 (1st Cir. 2010) and citing *In re Parcel Consultants, Inc.*, 58 Fed. App'x 946, 951 (3d Cir. 2003) ("Proof of prejudice is a necessary element of a due process claim."); *Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1520 (10th Cir. 1995) ("In order to establish a due process violation, petitioners must demonstrate that they have sustained prejudice as a result of the allegedly insufficient notice."); *In re New Concept Housing, Inc.*, 951 F.2d 932, 939 (8th Cir. 1991) (stating that "the violation of these rules constituted harmless error, because the Debtor's presence at the hearing would not have changed its outcome.  The Debtor had neither a legal nor factual basis for establishing that the settlement was unreasonable."); *Cedar Bluff Broad., Inc. v. Rasnake*, No. 90-1554, 1991 WL 141035, at *2 (4th Cir. Aug. 1, 1991) (creditor complaining of notice deficiency failed to show, among other things, "that it was prejudiced by the lack of notice to general creditors")); *Brock v. Dow Chem. U.S.A.*, 801 F.2d 926, 930-31

seek damages against Marsh for his injuries.  However, the 1986 Orders resulted in creating the Manville Trust.  Parra thus had the opportunity to seek damages for his asbestos-related injuries.  Parra has not explained why he did not collect from the Manville Trust, and why he is instead pursuing indirect claims.

## V.    CONCLUSION

Accordingly, the July Order is AFFIRMED in part, REVERSED in part, and REMANDED to the bankruptcy court for further proceedings consistent with this Opinion and Order.  The order directing the Clerk of Court to correct the docket (Docket No. 7) is vacated.  The Clerk of the Court is directed to amend the docket to remove Travelers Indemnity Company and Travelers Casualty and

_____

(7th Cir. 1986) (explaining in context of review of administrative order affecting an employer where improper notice was alleged, "it must be noted that, unless the employer demonstrates that the lack of formal notice was prejudicial, we will not order that the charges be dismissed").

Surety Company as appellees and to list them as interested parties. The Clerk of

Court is directed to close this appeal.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             March 14, 2016

**- Appearances -**

**For Appellant The Bogdan Law Firm as Counsel for Salvador Parra, Jr.:**

Sander L. Esserman, Esq.
Peter C. D'Apice, Esq.
David J. Parsons, Esq.
Heather J. Panko, Esq.
Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, TX 75201
(214) 969-4900

**For Appellee Marsh USA, Inc.**

Brian E. O'Connor, Esq.
Emma J. James, Esq.
Jonathan D. Waisnor, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

**For Travelers Indemnity Company and Travelers Casualty and Surety Company**

Andrew T. Frankel, Esq.
Alexander N. Li, Esq.
Tyler Z. Bernstein, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

44